[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————

No. 15-15228

————————————

BILLY LEON KEARSE,

Petitioner-Appellant,

*versus*

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,
ATTORNEY    GENERAL,    STATE    OF    FLORIDA,

Respondents-Appellees.

————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 2:09-cv-14240-WJZ

————————————

Before WILSON, LUCK, and ED CARNES, Circuit Judges.

LUCK, Circuit Judge:

Billy Kearse was convicted and sentenced to death for the 1991 murder of police officer Danny Parrish. Thirty years later, Kearse appeals the denial of his petition for a writ of habeas corpus under 28 U.S.C. section 2254. He contends that the Florida Supreme Court unreasonably applied *Strickland v. Washington*, 466 U.S. 668 (1984) in denying claims that his trial counsel was ineffective because he failed to investigate and prepare for the testimony of the state's mental health expert and he failed to investigate and present evidence of Officer Parrish's prior misconduct and difficulties dealing with the public. Kearse also contends that the Florida Supreme Court unreasonably applied *Atkins v. Virginia*, 536 U.S. 304 (2002) and *Roper v. Simmons*, 543 U.S. 551 (2005) in concluding that his death sentence was not cruel and unusual even though he had low-level intellectual functioning, mental and emotional impairments, and was eighteen years and eighty-four days old at the time of the murder. After careful review of the briefs and the record, and with the benefit of oral argument, we affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### The Murder

On the night of January 18, 1991, Kearse and his friend, Rhonda Pendleton, decided to pick up some pizza.  On their way back to Pendleton's home in Fort Pierce, Florida, Kearse drove the wrong way down a one-way street.  Officer Parrish saw Kearse driving the wrong way and pulled him over for a traffic stop. Kearse couldn't give Officer Parrish a valid driver's license because he didn't have one and he lied about his name and date of birth. Officer Parrish told Kearse that he would write Kearse three tickets and let him go if Kearse would tell him his real name.

Kearse kept lying about his name, so Officer Parrish told Kearse to get out of the car and put his hands on top of it.  When Officer Parrish went to handcuff Kearse, Kearse told Officer Parrish not to touch him and called Officer Parrish a "lying ass pig" and said "I'm not going no mother fuckin' where with you."  At some point, Officer Parrish accidentally hit Kearse below the eye with his handcuffs while trying to control Kearse.  A physical struggle followed during which Kearse snatched Officer Parrish's service pistol.

Kearse shot Officer Parrish, causing Officer Parrish to fall back.  Kearse briefly paused while Officer Parrish pleaded for his life—"Come on, man, don't do it, don't do it"—before firing off another round of bullets.  He fired again and again and again and again and again and again and again and again and again and again

and again—a total of thirteen bullets into Officer Parrish, killing him.

Kearse kept Officer Parrish's pistol, drove Pendleton home, and flattened his car's tire "[t]o keep the police off [him]." He told Pendleton that he killed Officer Parrish because he was on probation, he wasn't sure if there was a warrant out for his arrest, and he didn't want to go back to prison so soon after his release the month before. Kearse was arrested later that night and confessed that he shot Officer Parrish.

## The Trial

The State of Florida charged Kearse with first-degree murder and robbery with a firearm. Robert Udell, a defense attorney experienced with capital cases, was appointed to defend Kearse.

After a week-long trial in October 1991, the jury convicted Kearse on both counts. As required by Florida's capital-sentencing statute, the state trial court then held a separate sentencing hearing in front of the jury. The jury recommended that Kearse be sentenced to death, and the state trial court sentenced Kearse to death consistent with the jury's recommendation. The Florida Supreme Court affirmed Kearse's convictions but remanded for resentencing because of "errors relate[d] to the penalty phase instructions and the improper doubling of aggravating circumstances." *Kearse v. State*, 662 So. 2d 677, 685, 686 (Fla. 1995).

*Resentencing*

Resentencing was set for Monday, December 9, 1996. Thirteen days before the resentencing hearing, the state moved to have its mental health expert, Dr. Daniel Martell, examine Kearse. In response, Mr. Udell moved to continue the resentencing or to strike Dr. Martell as a witness. Mr. Udell argued that he only heard about the state's intent to use Dr. Martell as an expert witness after the state responded to a discovery demand on November 30. And he said he could not attend Dr. Martell's examination on the state's proposed dates because of scheduling conflicts. Mr. Udell also moved to: (1) limit the use of any information gathered from the examination; (2) declare unconstitutional Florida Rule of Criminal Procedure 3.202—the newly established rule that permitted the state to examine Kearse;[1] (3) prohibit application of rule 3.202; and (4) limit the scope of the examination.

On December 3, 1996, the state trial court held a hearing on Mr. Udell's motions. The state trial court granted the state's motion to examine Kearse and set the examination for December 5,

---

[1] Rule 3.202 first became effective on January 1, 1996. *See Amends. to Fla. Rule of Crim. Proc. 3.220—Discovery (3.202—Expert Testimony of Mental Mitigation During Penalty Phase of Cap. Trial)*, 674 So. 2d 83, 83–84 (Fla. 1995). It was later amended on May 2, 1996. *Id.* at 85. At the time of Kearse's resentencing, rule 3.202 provided that, "in those capital cases in which the state gives notice of its intent to seek the death penalty within 45 days from the date of arraignment . . . the court shall order that, within 48 hours after the defendant is convicted of capital murder, the defendant be examined by a mental health expert chosen by the state." *Id.*

the Thursday before the December 9 resentencing.  The state trial court denied Mr. Udell's motion to continue resentencing or to strike Dr. Martell as a witness, and deferred ruling on his other motions.

At the start of resentencing on December 9, Mr. Udell renewed his motion to continue or to strike Dr. Martell as a witness. Mr. Udell explained that three days earlier the state gave him "a copy of the raw data that Dr. Martell generated as a result of his mental health evaluation of [Kearse]" and that the data was "on its way to [Kearse's] experts for their review." But Mr. Udell wanted more time so he could research Dr. Martell's prior publications and expert opinions.  The state trial court denied the motion, concluding there were no grounds for a continuance and explaining that Mr. Udell could depose Dr. Martell in the evening or over a weekend.

Under Florida's capital-sentencing statute, the jury was required to consider whether at least one "aggravating circumstance" existed and, if so, whether there were sufficient "mitigating circumstances" to outweigh the aggravating circumstances the jury found. *See* Fla. Stat. § 921.141(2) (1996).  Mr. Udell sought to prove three statutory mitigating circumstances at resentencing:  (1) the murder was committed while Kearse was under the influence of extreme mental or emotional disturbance; (2) Kearse's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired; and (3) Kearse's age at the time of the murder.  *See id.* § 921.141(6)(b),

(f), (g). Mr. Udell also sought to prove forty non-statutory mitigating circumstances, including twenty-one related to Kearse's mental health.[2]

Mr. Udell called three mental health experts to prove the statutory and non-statutory mitigating factors related to Kearse's mental health.

<u>Kearse's mental health experts' testimony</u>

### 1. *Pamela Baker*

Pamela Baker, a licensed mental health counselor, first met Kearse in 1981. Mrs. Baker worked with children who had been referred to the state as abused, neglected, or ungovernable. Kearse was referred to Mrs. Baker as an ungovernable child because he left home without telling anyone and was having problems with his behavior and attendance at school. Kearse was only eight years old at the time, which was unusual because most children referred to the state were much older. Mrs. Baker explained that Kearse was committed to a county program for a few months and then returned to his mother's care.

Mrs. Baker's review of Kearse's records revealed that the state was concerned about whether he was suffering abuse at

---

[2] The non-statutory mitigating factors related to Kearse's mental health included "[f]etal alcohol effect including hyperactivity, attention deficit disorder, poor judgment and delayed learning," "[o]rganic brain damaged," "[l]ow I.Q., impulsive, and unable to reason abstractly," "mildly retarded and functioned at a third or fourth grade level," and "severely emotionally handicapped."

home.  It seemed that Kearse's mother had given up on him and had little interaction with him.  Kearse would often hoard food at school events because he was neglected at home, and he didn't want to leave the county program because he was eating better than he ate at home.  When Kearse was placed into the county program, he explained that he ran away from home because he got scared when his mother drank alcohol and fought with her boyfriend.  Kearse's mother agreed to participate in a state parenting program, but her participation was only superficial.

Mrs. Baker noted that Kearse was a juvenile delinquent by age eight.  He committed several offenses over the years, primarily burglaries and petty thefts, but his delinquency records didn't reflect a lot of aggressive behavior; Kearse would typically fight with someone only if they were first aggressive to him.

Mrs. Baker testified that her husband had taught Kearse and that he had no doubt that Kearse was severely emotionally handicapped and "operating at a retarded level."  By the time Kearse was thirteen and in the seventh grade, he could spell only two words: "cat" and "run."  Mrs. Baker taught Kearse for two years and also had no doubt that he was severely emotionally handicapped.  Mrs. Baker never thought Kearse would kill someone, although she did think that about other children she had encountered.  She described Kearse as being very hyperactive but not violent.

Mrs. Baker visited Kearse in 1991 after he was jailed for murdering Officer Parrish.  During the visit, Kearse discussed his upbringing.  He told Mrs. Baker that he was once punished by having

to walk around the block naked in front of his neighbors, that he had been tied to a bed and beaten, and that his mother would beat him with extension cords and coat hangers fashioned into clubs. Kearse also told Mrs. Baker that he started drinking alcohol when he was four or five years old, started smoking marijuana at the age of twelve or thirteen, and started smoking cigarettes at the age of fourteen. Kearse reported that he had been sexually molested when he was twelve years old and had lost his virginity to a thirty-one-year-old when he was less than sixteen years old.

Mrs. Baker diagnosed Kearse with "panic disorder." Mrs. Baker also thought that Kearse met the criteria for "conduct disorder." Mrs. Baker reviewed Kearse's medical records and noted that he had been diagnosed with "brain damage" and possibly suffered from fetal alcohol syndrome.

### 2. Dr. Fred Petrilla

Dr. Fred Petrilla, a licensed clinical psychologist, testified that he examined Kearse at the time of Kearse's trial in 1991 and again in 1996 shortly before resentencing. In 1991, Dr. Petrilla spent twenty hours with Kearse and met with Kearse's mother. Dr. Petrilla gave several tests to Kearse, including an intelligence test. The results of the tests suggested brain dysfunction. Although Kearse's IQ was 79—"within the borderline range of intelligence, with mentally retarded being 60 and down"—he was not mentally retarded. At the time, Kearse scored at a third-grade level for reading and spelling and at a fourth-grade level for arithmetic. Dr. Petrilla explained that the tests he gave Kearse accounted for whether

a patient was malingering and that he did not think that Kearse was malingering.

One of the tests Dr. Petrilla gave to Kearse was the Minnesota Multifacing Personality Inventory ("MMPI"). Dr. Petrilla gave the MMPI to Kearse in 1991 and again in 1996. The results showed that Kearse acted without thinking and was extremely sensitive. One of the factors in the test—the F Scale—considered whether a person was trying to fake their symptoms. Kearse's scores in 1991 weren't suggestive of malingering. However, Kearse's F Scale in 1996 was highly elevated. Although Dr. Petrilla conceded that he wasn't an expert in interpreting F Scale results, he believed that Kearse's elevated F Scale did not indicate malingering but was instead elevated for other reasons, including stress, brain damage, and emotional problems.

According to Dr. Petrilla, Kearse suffered from one of the broadest arrays of problems that he had seen in anyone he examined. Dr. Petrilla concluded that Kearse suffered from longstanding brain dysfunction and learning disabilities. Dr. Petrilla concluded that Kearse murdered Officer Parrish while Kearse "was under an extreme emotional disturbance" and that he was "still under an extreme emotional disturbance" at the time of resentencing. Dr. Petrilla also concluded that Kearse was substantially incapable of conforming his conduct to the requirements of the law at the time of the murder.

### 3.  Dr. Jonathan Lipman

Dr. Jonathan Lipman, a neuropharmacologist, examined Kearse for drug-related conditions.  Dr. Lipman spoke with Kearse's mother who confirmed that she abused alcohol while she was pregnant with Kearse.  He concluded that Kearse suffered from "[f]etal [a]lcohol [e]ffect, a milder form of [f]etal [a]lcohol [s]yndrome."  Dr. Lipman also had Kearse undergo several brain scans, the results of which suggested brain damage.  He spoke with Kearse about his recollection of the night of the murder and determined that Kearse was "confabulat[ing]."  Dr. Lipman explained that this meant Kearse was not lying but was instead filling the gaps in his memory with what he believed was reasonable.  He concluded that Kearse had acted impulsively on the night of the murder.

Dr. Lipman testified that he often relied on the reports of other experts to reach a professional opinion in a case.  And because Dr. Lipman was not a psychologist or neuropsychologist, he reached out to Dr. Lawrence Levine, a board-certified neuropsychologist, and Dr. Alan Friedman, a board-certified psychologist, to get their opinions on Dr. Martell's test results and Kearse's elevated F Scale.  Dr. Lipman recounted to the jury what Dr. Levine and Dr. Friedman had reported to him.

According to Dr. Lipman, Dr. Levine reviewed the results of Dr. Martell's examination of Kearse and explained that Kearse scored in the 50th percentile for a nine-and-a-half-year-old child on one of Dr. Martell's tests and that Kearse's score on another of Dr.

Martell's tests corroborated Dr. Petrilla's conclusion that Kearse suffered from a verbal memory disorder. Kearse's results from the verbal learning test also indicated, according to Dr. Levine, that he was not malingering. A third test that Dr. Levine reviewed showed low average performance and no malingering or exaggeration. Dr. Levine concluded that the test results showed brain dysfunction. Dr. Lipman discussed Dr. Levine's findings with Dr. Petrilla, who confirmed that they were consistent with his findings.

Dr. Lipman testified that Dr. Friedman was "the natural choice of a person" to interpret Kearse's elevated F Scale because Dr. Friedman was "recognized as the expert in [the MMPI]" and was "unique among[] psychological researchers in that he [wa]s the person that actually d[id] the raw studies of malingerers of disabled people, and he developed the norms." Dr. Lipman said that Dr. Friedman was the author of a "very famous paper" on the MMPI in which Dr. Friedman "provide[d] the tables of norms drawn from many people that he has evaluated by which to interpret F Scales." Dr. Lipman told the jury what Dr. Friedman had reported to him.

According to Dr. Lipman, Dr. Friedman reviewed Kearse's MMPI results and concluded that Kearse "understood the questions and answered honestly without any . . . symptom magnification whatsoever and answered consistently thereby generating a valid profile." Dr. Friedman said that Kearse's "F Scale . . . [was] in the valid range," thus "indicating a cooperative nondissimulating test taking attitude." Dr. Friedman concluded that "the elevation seen in all of . . . Kearse's MMPI profiles reflect[ed] psychiatric

disturbance" and that it was inappropriate to look only at the F Scale to assess whether Kearse was malingering. Dr. Friedman relied in part on the "F minus K index, which is a treatment that you give to the F Scale to interpret it." Dr. Friedman noted that Kearse's F minus K score was "significantly below" a benchmark for malingering.

### The state's mental health expert's testimony

The state's only witness in rebuttal was Dr. Martell. Dr. Martell disagreed with Mrs. Baker's diagnosis of panic disorder. Dr. Martell also thought that fetal alcohol effect—Dr. Lipman's diagnosis—was "not a mental disorder." Dr. Martell explained that the features of fetal alcohol effect could occur naturally without alcohol and said that "in the literature, there's a call to get rid of this term [f]etal [a]lcohol [e]ffects." Dr. Martell concluded that, in any event, it was "highly questionable" that Kearse suffered from fetal alcohol effect.

Dr. Martell testified that Kearse "ha[d] some areas of weakness but that he d[id] not have brain damage." Dr. Martell disagreed with Dr. Petrilla's finding of brain damage because Dr. Petrilla relied on a set of norms that had been criticized for not accounting for the age, sex, and educational background of the subject. Dr. Martell determined that any impairment shown on Dr. Petrilla's tests resulted from Kearse's depression.

Dr. Martell concluded that Kearse suffered from a conduct disorder as a child and didn't perform well academically because he

"made a choice not to apply himself in school." Dr. Martell also diagnosed Kearse with "antisocial personality disorder" and "psychopathy." Dr. Martell explained that neither diagnosis rose to the level of extreme emotional mental disturbance within the meaning of the statutory mitigating circumstance.

Dr. Martell also concluded that Kearse was "faking on [his] personality testing in an attempt to make himself look more impaired than he is." In Dr. Martell's opinion, Kearse's elevated F Scale in his MMPI results showed a "severe effort to fake the test." According to Dr. Martell, the MMPI results were "totally invalid," "uninterpretable," and "reflect[ed] an attempt on [Kearse's] part to fake crazy in order to avoid responsibility."

Dr. Martell stated that he had reviewed the information that Dr. Friedman had relayed through Dr. Lipman. Dr. Martell said that, although Dr. Friedman had been "portrayed . . . as the world's greatest expert on the MMPI," he wasn't. Dr. Martell explained that the F minus K index used by Dr. Friedman was "not consistently reliable as a method for determining whether a profile is invalid or not." Dr. Martell also faulted Dr. Friedman for not having personally examined Kearse. Dr. Martell concluded that Kearse was a pathological liar, and he rejected Dr. Lipman's determination that Kearse was confabulating.

In sum, Dr. Martell concluded that Kearse wasn't under the influence of an extreme mental or emotional disturbance when he murdered Officer Parrish. Dr. Martell also concluded that Kearse's capacity to appreciate the criminality of his conduct or to conform

his conduct to the requirements of the law at the time of the murder wasn't substantially impaired.  That conclusion was based on Dr. Martell's assessment of Kearse's behavior before, during, and after the murder.  Dr. Martell explained that Kearse:  (1) understood he had done something illegal by driving the wrong direction down a one-way street and that he was worried about violating his probation; (2) showed a capacity to conform his conduct to the requirements of the law because he decided to lie to Officer Parrish about his name and date of birth to avoid responsibility; (3) made a decision with "[e]ach squeeze of th[e] trigger" as he fired multiple series of rounds at Officer Parrish; and (4) made efforts to conceal his involvement by taking Officer Parrish's pistol with him, disabling the car when he got to Pendleton's home, and hiding the pistol.

On cross-examination, Mr. Udell highlighted that Dr. Martell hadn't spoken with Kearse's mother or several of the defense witnesses.  And Dr. Martell conceded that reasonable experts could form different opinions about the same set of facts.  Dr. Martell also admitted that if he were to have a pregnant wife, he wouldn't want her to drink alcohol like Kearse's mother had because it could have significant detrimental effects on their child and lead to brain dysfunction.  Dr. Martell confirmed that he hadn't studied the effects of alcohol on animals and that he didn't practice neuropharmacology.

Dr. Martell admitted that he relied on reports of Kearse's brain scans but hadn't reviewed the scans.  Dr. Martell also

acknowledged that his opinion about Kearse's lack of effort at school conflicted with the defense witnesses who said otherwise. And he admitted that the psychiatric manual he relied on—the Diagnostic and Statistical Manual of Mental Disorders—previously considered homosexuality to be a mental disorder.

Mr. Udell challenged Dr. Martell's conclusion that Kearse was capable of conforming his conduct to the requirements of the law based on Kearse's actions at the time of the murder. Mr. Udell asked Dr. Martell to explain when he thought that Kearse formed the intent to kill Officer Parrish, and Dr. Martell conceded that he "hadn't thought about it." Mr. Udell also asked Dr. Martell why Kearse didn't have a gun with him if he was determined to avoid arrest. Dr. Martell responded that Kearse likely didn't want to add a felon-in-possession charge to his record. Mr. Udell then highlighted a conflict in Dr. Martell's testimony: "He was willing to kill in order not to go back to jail but he wasn't willing to possess a firearm charge, he wasn't concerned about that but he was so concerned about not going back to jail that he'd kill an officer?" Mr. Udell similarly contrasted Dr. Martell's conclusion that Kearse was trying to conceal his involvement in the murder with the fact that Kearse confessed to killing Officer Parrish as soon as he met with police.

### Kearse's renewed death sentence

The jury unanimously recommended the death penalty and the state trial court followed that recommendation, finding that the aggravating circumstances of Kearse's crime outweighed the

mitigating ones.  The state trial court found two statutory aggravating circumstances.  First, the state trial court found that the murder was committed while Kearse was engaged in the commission of—or during flight after committing or attempting to commit—robbery.  And second, the state trial court found three other statutory aggravating circumstances which it merged into one because they involved a single aspect of the offense:  (1) the murder was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody; (2) the murder was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws; and (3) the victim was a law enforcement officer engaged in the performance of his official duties.

The state trial court found only one statutory mitigating circumstance—Kearse's age at the time of the murder.  The state trial court found three non-statutory mitigating circumstances: (1) Kearse cooperated with law enforcement; (2) his behavior at trial was acceptable; and (3) he had a difficult childhood that resulted in psychological and emotional problems.  The state trial court found that the mitigating circumstances were "not individually or in toto substantial or sufficient to outweigh the aggravating circumstances."

Kearse again appealed his death sentence to the Florida Supreme Court, but this time the court affirmed.  *Kearse v. State*, 770 So. 2d 1119, 1135 (Fla. 2000).

*State Postconviction Relief*

After the Florida Supreme Court affirmed Kearse's renewed death sentence on direct appeal, Kearse moved for postconviction relief in state court. Kearse claimed that he received ineffective assistance of counsel at resentencing because Mr. Udell failed to investigate and prepare for Dr. Martell's testimony. Kearse also claimed that he received ineffective assistance of counsel at resentencing because Mr. Udell failed to present evidence of "Officer Parrish's prior misconduct and difficulties in dealing with the public." Specifically, Kearse faulted Mr. Udell for calling none of the "several civilians" who had lodged complaints against Officer Parrish to testify at resentencing and for failing "to request Officer Parrish's complete personnel file from [the] Fort Pierce Police Department."

<u>Evidence relating to Kearse's ineffective assistance of counsel claim based on Mr. Udell's failure to investigate and prepare for Dr. Martell's testimony</u>

In April and May 2005, the state postconviction court held a five-day evidentiary hearing on both claims. As to his ineffective assistance of counsel claim based on Mr. Udell's failure to investigate and prepare for Dr. Martell's testimony, Kearse presented testimony from five mental health expert witnesses (Dr. Friedman, Dr. Lipman, Dr. Barry Crown, Dr. Richard Dudley, and Dr. Thomas Hyde), Mr. Udell, and Robert Norgard, an expert on the community standards for defense attorneys. The state called one witness, Dr. Martell.

### 1. *Dr. Friedman*

Dr. Friedman testified that he became involved in Kearse's case when he was contacted by Dr. Lipman in 1996. He testified that Dr. Lipman asked him to look at Kearse's MMPI data. He did so and determined that Kearse's MMPI results produced a "valid profile" because his F minus K index fell within a range that suggested "that the test [was] valid, that he wasn't faking, that it[ was] open to interpretation." Dr. Friedman explained that Kearse's "F(P) score" also indicated that "he was not exaggerating." Although Kearse's F Scale was elevated, which could suggest that Kearse was faking, he testified that Kearse's F Scale may have been high because Kearse had "serious maladjustment or psychiatric problems." He disagreed with Dr. Martell's finding that Kearse's MMPI results were "[t]otally invalid."

On cross-examination, Dr. Friedman admitted that the profile generated by Kearse's MMPI results was at least in part consistent with Dr. Martell's findings. He also conceded that Dr. Martell "had an advantage in being able to interview [Kearse]." And he agreed that whether an F Scale showed malingering was subject to interpretation. Dr. Friedman confirmed that Dr. Lipman's recitation of his opinion at resentencing was largely accurate.

Dr. Friedman would have testified at Kearse's resentencing if he had been asked to.

### 2. Dr. Lipman

Dr. Lipman testified that Mr. Udell hired him to testify at Kearse's resentencing. He was qualified to testify as an expert about MMPI results, although he "would normally request another consultation . . . for [his] own edification." He consulted Dr. Petrilla about Kearse's MMPI results, and Dr. Petrilla told Dr. Lipman that he thought Kearse's MMPI results were invalid. Dr. Lipman knew from his own research that Dr. Petrilla "was probably not correct about [that]," so he sought an "outside opinion" from Dr. Friedman. Mr. Udell never had any interaction with Dr. Friedman, and Dr. Lipman paid for Dr. Friedman's services.

At the time of resentencing, Dr. Lipman had not been provided Dr. Martell's deposition, report, or videotaped examination of Kearse. He didn't agree with Dr. Martell's findings. It was clear to him that Kearse had a "developmental disorder" and suffered from fetal alcohol effect.

On cross-examination, Dr. Lipman agreed that he had "sufficient information" to support his opinion that Kearse suffered from fetal alcohol effect. He also agreed that Mr. Udell "overwhelmed [him] with paperwork" and materials to rely on. No new information had been given to Dr. Lipman since the resentencing that would've changed his opinion that Kearse suffered from fetal alcohol effect.

### 3. Dr. Crown

Dr. Crown, a licensed psychologist, testified that he examined Kearse on December 9, 2002, and gave him neuropsychological tests. One of the tests showed that Kearse "was putting forth good effort, good motivation, no indication of malingering or exaggerating or faking." Dr. Crown concluded that Kearse was "impaired" and had "neuropsychological deficits," and he confirmed that his findings were consistent with Dr. Petrilla's. Dr. Crown's findings were also consistent with reports of doctors who had examined Kearse after resentencing—specifically, Drs. Hyde and Dudley. The common finding among the doctors was that Kearse "ha[d] low levels of functioning" and was "brain damaged."

Dr. Crown understood that when Dr. Petrilla gave the MMPI to Kearse, the questions had to be read to him. Dr. Crown thought it was "highly unlikely" that an MMPI given to Kearse would yield a valid result because the MMPI requires an eighth-grade reading level and Kearse was approximately at a sixth-grade reading level.

Dr. Crown reviewed the videotape and transcript of Dr. Martell's examination of Kearse and didn't think it was a standard neuropsychological clinical interview. Dr. Crown conceded that Dr. Martell didn't "get in . . . Kearse's face," probe[] him like he was a police interrogator," or give him a "hard sell." Instead, Dr. Crown found the examination "confrontational" because it involved "negative priming"—"the first thing [Dr. Martell] did was tell . . . Kearse he wanted to discuss the crime, . . . which tends to

create a negative set." Dr. Crown disagreed with Dr. Martell's ultimate findings about Kearse.

### 4. Dr. Dudley

Dr. Dudley, a physician with a specialty in psychiatry, testified that he performed a psychiatric evaluation of Kearse on February 10, 2003. Dr. Dudley reached four conclusions based on his evaluation: (1) Kearse had "long-standing cognitive difficulties" that "certainly impaired his decision making [and] the impulsivity of his acts"; (2) Kearse suffered from post-traumatic stress disorder; (3) Kearse "had learning difficulties at minimum, and possibly [attention deficit hyperactivity disorder]"; and (4) Kearse had a "substance abuse diagnosis." Dr. Dudley also testified that Kearse's cognitive functioning was below where it should be and that Kearse wasn't able to conform his conduct to the requirements of the law when he murdered Officer Parrish. Dr. Dudley explained that his findings were consistent with Dr. Petrilla's and Dr. Lipman's testimony at resentencing and with Dr. Crown's and Dr. Hyde's findings.

Dr. Dudley reviewed the videotape of Dr. Martell's examination of Kearse and concluded that Dr. Martell should've done more to follow up on some topics. Dr. Dudley disagreed with Dr. Martell's findings that Kearse chose not to perform at school and that there was no evidence that Kearse suffered from a major mental disorder.

Dr. Dudley would've been available to testify at Kearse's re-sentencing had he been asked to.

### 5. Dr. Hyde

Dr. Hyde, a board-certified neurologist, testified that he per-formed a clinical evaluation of Kearse a few months before the postconviction hearing. Dr. Hyde concluded that Kearse suffered from "attention deficit hyperactivity disorder in childhood with re-sidual attention deficit symptoms into adulthood." Dr. Hyde also concluded that Kearse had "brain damage" and "abnormalities [that] would be compatible with developmental dysfunction of the central nervous system." Dr. Hyde's findings were consistent with Dr. Crown's, Dr. Dudley's, and Dr. Petrilla's. According to Dr. Hyde, Kearse didn't exhibit any signs of malingering during the evaluation.

Dr. Hyde disagreed with Dr. Martell's opinion that Kearse suffered from antisocial personality disorder. Dr. Hyde explained that the neuropsychologists he worked with in his clinical practice "usually conduct[ed] their examinations quite differently than Dr. Martell did" because "[t]hey rel[ied] much more heavily on testing batteries," "[t]hey usually follow[ed] a . . . structured diagnostic in-terview when trying to reach psychiatric diagnoses," and "[t]hey seem[ed] to explore all aspects of possible psychiatric pathology in a greater and more organized fashion." Dr. Hyde thought that Dr. Martell's examination of Kearse "was heavily weighted towards personality disorders and antisocial personality disorder in general,

and was not as broad based an interview and examination of [Kearse] for looking for all aspects of psychiatric diagnoses."

### 6. Mr. Udell

Mr. Udell testified that his strategy at Kearse's resentencing was to establish mitigating circumstances based on Kearse's impoverished background, his age, and the fact that he suffered from fetal alcohol effect.

Mr. Udell didn't know when he first became aware that the state sought to have Dr. Martell examine Kearse. Mr. Udell said that Kearse's resentencing may have been the first time he had dealt with Dr. Martell. When asked whether he had made any attempt to investigate Dr. Martell's background, Mr. Udell said that he "would have asked the lawyers that [he] kn[e]w who had been doing this kind of work for many years" if they knew of Dr. Martell, "but that's as far as it would have gone."

Mr. Udell couldn't remember if he'd obtained Dr. Martell's resume. And he didn't think he'd ever deposed Dr. Martell. Mr. Udell explained that he was a "firm believer of doing very little discovery on the record in the presence of the [s]tate [a]ttorney" because "[e]very time you take a deposition, they learn one thing about your case that but for your deposition they wouldn't have known."

Mr. Udell said that he "would have known what [Dr. Martell] was going to say" because he "would have either had a report or [he] would have asked the [s]tate [a]ttorney what [Dr. Martell

15-15228          Opinion of the Court                    25

was going to] say."  Mr. Udell explained that it was not unusual for defense counsel and the state attorney to ask each other what their witnesses were going to say.  Mr. Udell had known the state attorneys in Kearse's case for many years, and they had a professional courtesy of sharing information with each other.

The transcript of Dr. Martell's examination of Kearse reflected that Mr. Udell was present at the beginning but left shortly after it started.  Mr. Udell asked Dr. Martell whether he and the state attorney needed to be present, and Dr. Martell said that he preferred to do the examination alone with Kearse, so Mr. Udell and the state attorney left.  Mr. Udell didn't know if he ever reviewed the videotape of the examination.

On cross-examination, Mr. Udell said he thought he "put on everything there was concerning [Kearse], his social history, mental health history, [and] organic brain problems."  Mr. Udell "spoke to all the people in the juvenile system who knew [Kearse]."  Generally speaking, jurors in Indian River County, where the trial was held, were "not big fans of mental health testimony," so Mr. Udell tried to play to their sensibilities.  Mr. Udell thought that "bringing in all [of Kearse's former] teachers . . . would send a message to the jury, forget the mental health experts, we're on your level, this is a good kid."  Mr. Udell explained that he was familiar with the medical terminology; when he spoke casually at trial, it was a strategy not to appear smarter than the jury.

Mr. Udell explained that he had Dr. Lipman relay Dr. Friedman's opinion that Kearse's F Scale scores did not show that Kearse

26                    Opinion of the Court                15-15228

was malingering because he "knew what [Dr.] Martell was going to say" at resentencing.  A letter that Mr. Udell had written to Dr. Lipman confirmed that Mr. Udell planned to use Dr. Lipman to anticipatorily rebut Dr. Martell's testimony.  Mr. Udell agreed that he used Dr. Petrilla and Dr. Lipman to rebut Dr. Martell's opinions.  Mr. Udell also confirmed that Dr. Lipman reviewed Dr. Martell's test data.  Mr. Udell "knew going into trial exactly what Dr. Martell was going to say as to which statutory aggravators and/or mitigators existed, and what his test results supposedly revealed, and where he disagreed with Dr. Petrilla."  Mr. Udell didn't separately call Dr. Friedman to testify because he could get the "same information to the jury through [Dr.] Lipman."

### 7.  Robert Norgard

Robert Norgard, a defense attorney experienced with capital cases, testified as an expert about the community standards for defense attorneys at the time of Kearse's resentencing.[3]  Mr. Norgard

---

[3] Although we summarize and discuss Mr. Norgard's testimony here and elsewhere, we so do with the understanding that, as an "experienced capital defense attorney[]," his "views of what constitutes effective assistance in capital cases" are "not dispositive," and, indeed, they have little, if any, weight in our analysis. *See Newland v. Hall*, 527 F.3d 1162, 1208 (11th Cir. 2008); *see also Provenzano v. Singletary,* 148 F.3d 1327, 1332 (11th Cir. 1998) ("Our . . . decisions establish that the reasonableness of a strategic choice is a question of law to be decided by the court, not a matter subject to factual inquiry and evidentiary proof.  Accordingly, it would not matter if a petitioner could assemble affidavits from a dozen attorneys swearing that the strategy used at his trial was unreasonable.").

said that it would be "extremely improper" to have experts relay testimony of other experts outside their own expertise because they would have "no basis or experience to defend the information they're providing" and would be "vulnerable to cross examination."

Mr. Norgard explained that there were "a lot of different tactical and strategic ways to go about preparing to deal with" a state's mental health expert. If the defendant took part in a videotaped mental health evaluation, "you would certainly want to review and be familiar with the evaluation." However, whether to attend the evaluation "would be a tactical and strategic decision by the attorney." Mr. Norgard noted that "[i]n some instances the [s]tate may call upon a local expert, someone that [was] routinely used in your geographic area that you may already be familiar with." Whether to depose an expert would be "within the tactical and strategic province of the attorney" and "would vary from case to case."

Mr. Norgard "would never say that you always have to depose an expert." For example, an attorney could decide against deposing an expert because there may be things "you don't want the other side to know about." Mr. Norgard agreed that even the best criminal defense lawyers might have different approaches to defending a particular client.

### 8. Dr. Martell

The state called Dr. Martell. Dr. Martell testified that his opinion about Kearse remained the same despite hearing Dr.

Friedman's testimony. Dr. Martell noted that "Dr. Friedman didn't have the advantage of looking at the 1991 MMPI profile," and Dr. Martell disagreed with Dr. Friedman's testimony about the F minus K index. Dr. Martell believed he was in a better position than Dr. Friedman to interpret Kearse's MMPI results and assess whether Kearse was malingering because he had the advantage of personally examining Kearse.

Dr. Martell remembered Mr. Udell coming to his examination of Kearse. Dr. Martell recalled that Mr. Udell asked him to begin the examination by asking about the facts of the crime so that he could object and make a record. Dr. Martell agreed to that request and began with the crime. Mr. Udell made his objection and then left.

Dr. Martell didn't think he'd ever been formally deposed in Kearse's case. He also couldn't remember if he gave any information about his examination of Kearse to Mr. Udell before resentencing. Dr. Martell thought that he and Mr. Udell might've had "an informal conversation about the scope of [his] testimony before [he] took the stand."

Evidence relating to Kearse's ineffective assistance of counsel
claim based on Mr. Udell's failure to present evidence of Officer
Parrish's prior misconduct and difficulties dealing with the public

As to his ineffective assistance of counsel claim based on Mr. Udell's failure to present evidence of "Officer Parrish's prior misconduct and difficulties in dealing with the public," Kearse

presented testimony from his investigator at resentencing and four citizens who had negative encounters with Officer Parrish. Kearse also called Mr. Udell to testify about his failure to obtain Officer Parrish's personnel file and his decision not to call citizens to testify about their negative encounters with Officer Parrish. And Kearse presented testimony from Mr. Norgard about the community standards for defense attorneys dealing with cases involving the murder of a police officer.

### 1. Anne Evans

Anne Evans, Kearse's investigator at resentencing, testified that, when Mr. Udell hired her in 1996, she interviewed "some individuals who had come in contact with [Officer Parrish] while he was a police officer, and [asked about] the experiences they had." Investigator Evans explained that Mr. Udell "gave [her] a list of names who had allegedly made complaints against [Officer Parrish], and asked [her] if [she] would go out and interview them." Investigator Evans also interviewed Kearse's family members and "tr[ied] to develop new witnesses" through her investigation.

Investigator Evans didn't have access to any of Officer Parrish's employment records despite "specifically" asking Mr. Udell to request them and telling Mr. Udell that she "thought it was very important" to get Officer Parrish's personnel file. Both Investigator Evans and Kearse thought that the citizen complaints should've been presented at resentencing, but Mr. Udell said he wasn't going to present any of them.

### 2. Tracey Davis

Tracey Davis testified about her negative encounter with Officer Parrish. She testified that Officer Parrish pulled her over and wouldn't tell her what she had done wrong. They argued for about thirty to forty-five minutes before Officer Parrish told Ms. Davis what she was being charged with. Ms. Davis's mother eventually arrived, and Officer Parrish "very rudely told her" that he didn't have to explain anything to her.

Ms. Davis felt like Officer Parrish was "racially motivated to stop [her]." Ms. Davis thought that Officer Parrish targeted her because she lived in an "old black neighborhood" that was "crime ridden." She explained that "it was dark" out and that Officer Parrish "couldn't tell who was driving [her] vehicle at first." Ms. Davis thought that Officer Parrish followed her "figuring [she] was going into a drug area."

Ms. Davis immediately filed a complaint with the police department because Officer Parrish "was very unprofessional," harassed her, and belittled her. Ms. Davis wasn't surprised to learn that Officer Parrish had gotten "into a scuffle with a civilian" and died.

On cross-examination, Ms. Davis admitted that she had a "bad attitude" and cursed at Officer Parrish when he pulled her over. When questioned about Officer Parrish's report that Ms. Davis asked him, "[W]hat are you f***ing white cops doing up here anyway, why aren't you down f***ing with your own kind?", Ms.

Davis testified that she was "pretty sure [she] didn't say that." Ms. Davis conceded that, although she had used the "N word" in her letter to the police department about her encounter with Officer Parrish, Officer Parrish "never used any racial terms" during the encounter. She also conceded that Officer Parrish never "physically intimidated" her—she just "didn't like [his] attitude."

Ms. Davis was never contacted by Mr. Udell to testify at Kearse's trial or at his resentencing, but she would have been willing and available to testify.

### 3. Fabian Butler

Fabian Butler, Kearse's maternal cousin, also had a negative encounter with Officer Parrish. On his way home one night, Mr. Butler stopped to talk to some friends at a street corner. Mr. Butler didn't want to be "affiliated with what [they were] doing," so he kept walking home.

By the time he had gotten about ten to fifteen steps away from the corner, a police car pulled up, and the officer—who Mr. Butler later learned was Officer Parrish—said to stop. Mr. Butler kept walking and assumed that Officer Parrish was talking to the people on the corner. Mr. Butler stopped when he heard a pistol cocking.

Officer Parrish pointed his pistol at Mr. Butler and told him to "shut up" after Mr. Butler asked what he had done wrong. Officer Parrish "made open threats" and said, "I'm the type of officer

I'm gonna do bodily harm to you and put you in jail and put you in a holding cell and don't let nobody see you."

Mr. Butler did not make a complaint against Officer Parrish after the incident because he did not know he could file complaints against police officers. Mr. Butler was not asked to testify at either Kearse's trial or resentencing but would have been willing to testify at both had he been asked to do so.

### 4. *Charles Pullen*

Charles Pullen testified about an encounter with Officer Parrish that occurred while he was walking home one day. Officer Parrish mistook Mr. Pullen for his brother and handcuffed Mr. Pullen to a tree, where red ants started biting him. Mr. Pullen told Officer Parrish ants were biting him, but Officer Parrish said that he didn't "give a damn." Mr. Pullen was handcuffed to the tree for about five to ten minutes. The ant bites on Mr. Pullen's leg got infected, and he had to take medications.

On cross-examination, Mr. Pullen confirmed that he had been "arrested twenty times" before 1991 and had been in and out of jail. Mr. Pullen conceded that he never filed a complaint against Officer Parrish after the incident.

Mr. Udell contacted Mr. Pullen before Kearse's trial but did not ask him to testify. Mr. Pullen would've been willing to testify at Kearse's trial and resentencing had he been asked to do so.

### 5. Eric Jones

Eric Jones testified that he had multiple negative encounters with Officer Parrish.  One time, Mr. Jones was pulled over by a female officer who told him to stay in his car while she waited for another officer to arrive.  When Officer Parrish arrived, Mr. Jones got out of his car.  Officer Parrish immediately "became extremely authoritative" and demanded that Mr. Jones get in his car.

Officer Parrish and the female officer asked him to sign a ticket that they had written.  Mr. Jones said that he couldn't read the ticket because it was dark and he asked to read it in the light. Officer Parrish told Mr. Jones that he didn't need to know what the ticket said and that he didn't have the right to read it.  As Mr. Jones opened his door to get in the light and read the ticket, Officer Parrish got directly in Mr. Jones's face, and Mr. Jones could "feel that [Officer Parrish] wanted [Mr. Jones] to just do something to provoke him."  Mr. Jones felt threatened and got back in his car. Mr. Jones drove away but, "within minutes" of leaving, Officer Parrish pulled him over.  Mr. Jones rolled his car window down four inches and didn't say anything because he felt that he was in danger.  Officer Parrish told Mr. Jones he was "tailgating" and wrote him a ticket.

Three weeks later, Officer Parrish drove alongside Mr. Jones and yelled out the window for him to pull over.  Officer Parrish wrote Mr. Jones another ticket.  After this encounter, Mr. Jones filed a complaint with the Fort Pierce Police Department.  Mr.

Jones "wasn't surprised a bit" when he found out that Officer Parrish had been killed.

On cross-examination, Mr. Jones admitted that he'd had problems with the Fort Pierce Police Department before his encounter with Officer Parrish, but "really d[idn't] recall" whether he had reported that he "believe[d] [he was] being picked on by the Fort Pierce Police Department." Mr. Jones testified that he "d[idn't] recall" whether he'd been speeding when the female officer pulled him over but admitted that he'd been tailgating when Officer Parrish pulled him over the first time. Mr. Jones also testified that he challenged the ticket that Officer Parrish issued him for tailgating but that he was "found guilty" because "you always lose in traffic court with a patrol officer." And Mr. Jones testified that Officer Parrish "didn't make any threats against [him]."

Mr. Jones met with Mr. Udell before Kearse's trial but he didn't want to testify. Mr. Jones was subpoenaed to appear at Kearse's resentencing but said that his testimony "wouldn't [have] happened" and, in any event, he wasn't asked to testify.[4]

---

[4] Kearse also called two investigators to testify about their conversations with Pastor James Newton. According to the investigators, Pastor Newton knew Officer Parrish from church and thought that Officer Parrish "had a hot temper," "had a reputation for provoking people at traffic stops," "pushed the envelope in every situation," was "racist," "[b]igoted[,] and ignorant," and "used derogatory slurs," including the N-word. The state postconviction court declined to consider the evidence of Pastor Newton's comments about Officer Parrish because the comments were "inadmissible hearsay." Kearse does not

### 6. Mr. Udell

Mr. Udell testified that he filed a formal demand for discovery with the Fort Pierce Police Department before Kearse's resentencing. He "specifically only asked for complaints against [Officer] Parrish," and the police department gave him six citizen complaints in response. Mr. Udell asked his investigators to follow up on the complaints, and he and his investigators located and visited a couple of the complainants.

The complaints generally suggested that Officer Parrish "was pretty aggressive in his handling of the citizens in the community" and that "he was a racist." Mr. Udell considered having some complainants testify at trial, but he decided against it because what they were willing to testify to wasn't sufficiently helpful. Mr. Udell thought that "if you're going to slam a victim, you'd better be able to pull it off," so he made an "educated strategy decision" not to have the complainants testify because "it would['ve] be[en] more harmful than helpful."

Mr. Udell recognized that if he introduced any of the complaints against Officer Parrish, then the state could introduce evidence that the police department found the complaints not credible. Mr. Udell was also concerned that the state could undermine the complaints against Officer Parrish by faulting the complainants' actions. One complainant, for example, told Officer Parrish that he

---

challenge the exclusion of the evidence of Pastor Newton's statements on appeal.

was arrested for murder and had "shot a cop but . . . missed." Another complainant had "called [Officer Parrish] a pinhead and used the F word," and the complainant's wife later described his conduct as being more offensive than Officer Parrish's.

Mr. Udell thought that painting the victim as an aggressor could "backfire" against Kearse, particularly in a capital case. Mr. Udell understood that the jury wouldn't place great emphasis on the citizen complaints against Officer Parrish because police officers were often subject to complaints. And Mr. Udell knew from experience that blaming a law enforcement officer for his own murder would be a poor strategy in Indian River County:

> [T]he analysis may have been different if we were in New York, Philly, Boston, even West Palm Beach. I've tried cases in Indian River County. They're good Americans, they're solid Americans, they believe in the integrity of law enforcement, and we didn't believe we reached the tipping point where we could convince them that they should think otherwise in this case.

Although Mr. Udell recognized that a victim-blaming strategy might work in some cases, he didn't think he had an evidentiary basis to do so in Kearse's case. Mr. Udell decided not to go with a vilification strategy because Pendleton, Kearse's passenger on the night of the murder, described Officer Parrish as being polite, professional, and friendly. Pendleton had also testified that Kearse told her Officer Parrish was polite. Moreover, the citations

found in Officer Parrish's car after the murder suggested that he was going to let Kearse go.

Mr. Udell couldn't remember if he ever obtained Officer Parrish's personnel file.  Kearse's postconviction counsel showed Mr. Udell the personnel file, which included performance evaluations that said that Officer Parrish "d[id] have a problem at times with the public on normal every day type problems," "ha[d] a tendency to get impatient in his dealings with the public," and tended to be "excited."

But the personnel file also contained positive material, including a "Memorandum of Commendation" which recognized Officer Parrish's heroism in "helping a juvenile that was threatening suicide and d[e]fus[ing] the situation," and performance evaluations that rated Officer Parrish's "meeting and dealing with the public" as "satisfactory," described Officer Parrish as "an asset to the police department" who was "always working a hundred percent on the streets," and noted that Officer Parrish "donat[ed] time to serve on the Honor Guard."

After reviewing Officer Parrish's personnel file, Mr. Udell couldn't say whether he would have done anything differently if he had gotten it before resentencing. Mr. Udell conceded that the negative employee evaluations in the personnel file would've supported a blame-the-victim strategy at resentencing. But Mr. Udell also recognized that the state would've rebutted that strategy by highlighting the positive elements in Officer Parrish's personnel file.

### 7. Mr. Norgard

Mr. Norgard testified that he had experience dealing with cases involving the murder of a police officer and said that in some cases it would be important to look at the police officer's personnel file. Mr. Norgard explained that a police officer's personnel file's importance would depend on its relevancy to the case; in other words, it would depend on the circumstances of the killing and whether there was a dispute about the police officer being the aggressor.

### The state postconviction court denied Kearse's motion for postconviction relief

After the evidentiary hearing, the state postconviction court denied Kearse's motion for postconviction relief. The state postconviction court denied Kearse's ineffective assistance of counsel claim that Mr. Udell failed to prepare for Dr. Martell's testimony because "it [was] apparent from the record that [Mr.] Udell knew or anticipated the substance of Dr. Martell's testimony despite not having deposed Dr. Martell," and reasoned that Mr. Udell couldn't "be held responsible for the ruling just weeks before commencement of the second penalty phase compelling the [s]tate's mental health examination of Kearse." The state postconviction court concluded that Mr. Udell's "strategy to proceed without deposing Dr. Martell [was] reasonable under the circumstances."

The state postconviction court also denied Kearse's ineffective assistance of counsel claim that Mr. Udell failed to present

evidence of Officer Parrish's prior misconduct and difficulties in dealing with the public.  The state postconviction court determined that Mr. Udell's "strategy not to pursue the victim vilification defense [was] reasonable" based on:  (1) Mr. Udell's "consideration of alternatives"; (2) the absence of "stronger evidence of [Officer] Parrish's prior misconduct"; and (3) the absence of "evidence that [Officer] Parrish abused Kearse during the traffic stop."  And the state postconviction court found "no prejudice" in Mr. Udell's failure "to obtain and consider [Officer Parrish's personnel file] prior to making a strategic decision not to pursue a strategy vilifying [Officer] Parrish" because "[a]n evaluation closer to the time of the traffic stop noted satisfactory job performance" and "the file contained other positive material concerning [Officer] Parrish's performance that the [s]tate could have used to rebut any claims of misconduct."

<u>Kearse's appeal of the denial of his motion for postconviction relief to the Florida Supreme Court and his petition to the Florida Supreme Court for a writ of habeas corpus</u>

Kearse appealed the denial of his motion for postconviction relief to the Florida Supreme Court.  Kearse argued that Mr. Udell "rendered constitutionally ineffective assistance" during the resentencing because he "fail[ed] to investigate and prepare for testimony of the state's mental health expert."  Kearse argued that Mr. Udell "made no effort to investigate" Dr. Martell and he "did not attempt to verify Dr. Martell's credentials or ascertain what testimony Dr. Martell was going to offer."  Mr. Udell, Kearse contended, "had no idea what Dr. Martell was going to say" and left

"Kearse's expert witnesses . . . inadequately prepared to rebut Dr. Martell's opinions."

Kearse also argued that Mr. Udell was ineffective "in two respects in failing to investigate and present evidence of Officer Parrish's prior misconduct as a law enforcement officer and Officer Parrish's difficulties in dealing with the public." First, Kearse argued that "Mr. Udell neglected to obtain Officer Parrish's complete personnel file from the Fort Pierce Police Department which indicated numerous deficiencies in Officer Parrish's job performance that were relevant to the issues presented in [Kearse's] case." And second, Kearse argued that Mr. Udell "failed to fully investigate the complaint reports and failed to call any of the complainants to testify."

Finally, Kearse petitioned the Florida Supreme Court for a writ of habeas corpus. Citing *Atkins* and *Roper*, Kearse argued that his "low level of intellectual functioning and mental and emotional impairments, in combination with his age at the time of the offense (eighteen and three months)," rendered his death sentence unconstitutional.

<u>The Florida Supreme Court's affirmance of the denial of Kearse's motion for postconviction relief and its denial of his petition for a writ of habeas corpus</u>

The Florida Supreme Court affirmed the denial of Kearse's motion for postconviction relief. *See Kearse v. State*, 969 So. 2d 976 (Fla. 2007). The Florida Supreme Court concluded that

Kearse's claim that Mr. Udell was ineffective for failing to investigate and prepare for Dr. Martell's testimony "fail[ed] to meet *Strickland*'s requirements":

> The record shows that Dr. Martell examined Kearse on the Thursday before the resentencing proceedings began the following Monday, and that [Mr. Udell's] motion for a continuance was denied. Upon receipt of Dr. Martell's raw data and report, [Mr. Udell] forwarded these to his experts and consulted with them about the information. He also consulted the state attorney regarding [Dr.] Martell's upcoming testimony. At the postconviction hearing, [Mr. Udell] testified that despite not having deposed [Dr.] Martell, he knew what Dr. Martell's testimony would be regarding statutory mitigators, what his test results supposedly revealed, and where [Dr.] Martell's testimony would differ from his own experts' testimony. As evidenced from the foregoing summary, the evidence shows that [Mr.] Udell correctly anticipated [Dr.] Martell's testimony. Kearse thus has not demonstrated anything material that [Mr. Udell] did not anticipate or could have done differently had he deposed Dr. Martell.

*Id.* at 985–86.

The Florida Supreme Court also affirmed the denial of Kearse's claim that Mr. Udell was ineffective for failing to investigate and present evidence of Officer Parrish's prior misconduct and difficulties dealing with the public. *See id.* at 986. The Florida

Supreme Court found that Mr. Udell "considered this strategy [to vilify Officer Parrish] and investigated citizen complaints against Officer Parrish," but, "after considering several factors—including the refusal of some witnesses to testify, the lack of substance of some testimony, and determinations by the Fort Pierce police that formal complaints against [Officer Parrish] were unfounded—he ultimately decided not to use this strategy." *Id.* The Florida Supreme Court also found that Mr. Udell "considered the potential that the strategy would backfire, especially in light of the facts, such as Kearse's firing thirteen bullets into [Officer Parrish] as [Officer Parrish] pled for his life and [Pendleton's] testimony that at all times Officer Parrish was friendly and polite." *Id.* Based on these findings, the Florida Supreme Court concluded that Mr. Udell's "decision not to present this mitigation strategy was reasonable." *Id.*

The Florida Supreme Court determined that Kearse was not prejudiced by Mr. Udell's failure to obtain Officer Parrish's personnel file because "the evidence at the postconviction hearing showed that any evidence in the file supporting the vilification mitigation could have been countered at trial by other evidence in it of Officer Parrish's good reports and commendations." *Id.*

Finally, the Florida Supreme Court denied Kearse's petition for a writ of habeas corpus because his death penalty didn't violate his Eighth Amendment rights under *Atkins* and *Roper*:

> [Kearse] argues that because of his age, low level of intellectual functioning, and mental and emotional

impairments he cannot be executed under *Atkins* . . . , which prohibited execution of people with mental retardation. However, Kearse's own expert at the resentencing testified that he was not mentally retarded, and he presented no evidence at his postconviction hearing that he was. Thus, his sentence is not unconstitutional under *Atkins*.

Next, he argues that because he was only eighteen years and three months old at the time of the crime and had low level intellectual functioning and mental and emotional impairments, he cannot be executed under *Roper* . . . . *Roper* prohibited execution of any defendant who was under age eighteen at the time of the crime. Accordingly, Kearse does not qualify for exemption from execution under *Roper*.

*Id.* at 991–92 (citation omitted).

*Federal Postconviction Relief*

After the Florida Supreme Court affirmed the denial of his motion for postconviction relief and denied his petition for a writ of habeas corpus, Kearse filed a 28 U.S.C. section 2254 petition in the Southern District of Florida. Kearse argued that the Florida Supreme Court unreasonably applied *Strickland* in affirming the denial of his claims that Mr. Udell was ineffective at resentencing because Mr. Udell: (1) failed to "investigate and prepare" for Dr. Martell's testimony; and (2) failed to "investigate and present evidence of Officer Parrish's prior misconduct and difficulties dealing with the public." Kearse also argued that the Florida Supreme

Court unreasonably applied *Atkins* and *Roper* in determining that his death sentence was not cruel and unusual because his "low level of intellectual functioning and mental and emotional impairments, in combination with his age at the time of the offense (eighteen and three months), render[ed] him categorically less culpable than the average criminal."

The district court denied Kearse's section 2254 petition. It reviewed de novo his claim that Mr. Udell was ineffective for failing to investigate and prepare for Dr. Martell's testimony. The district court reviewed this claim de novo, rather than under the Antiterrorism and Effective Death Penalty Act of 1996, because, it concluded, the claim failed even under the harder-to-meet de novo standard. Applying de novo review, the district court denied this claim because Mr. Udell's performance didn't prejudice Kearse. The district court reasoned that there was "little evidence" that the "testimony from additional experts" at the postconviction hearing "would have added anything additional to the penalty phase to which Dr. Lipman or Dr. Petrilla did not already testify." Thus, the district court "f[ound] that there was not a reasonable probability of a different result" "[g]iven the strong aggravation evidence presented that was in comparison with the mitigation evidence that was presented and could have been presented had [Mr. Udell] not rendered a deficient performance."

The district court also denied Kearse's claim that Mr. Udell was ineffective for failing to investigate and present evidence of Officer Parrish's prior misconduct and difficulties dealing with the

public.   The district court concluded that the Florida Supreme Court did not unreasonably apply *Strickland* in finding that Mr. Udell made a strategic decision not to vilify Officer Parrish because "[t]he record is clear that Mr. Udell viewed not calling the citizen complainant witnesses to the stand as a strategic one."   And, the district court wrote, the Florida Supreme Court did not unreasonably apply *Strickland* in concluding that Mr. Udell's strategic decision was reasonable because Mr. Udell made the decision based on his and his investigators' interviews of the witnesses and his determination that their testimony "would['ve] be[en] more harmful than helpful."   The district court also concluded that Kearse did not show that the Florida Supreme Court unreasonably applied *Strickland* by determining that Mr. Udell's failure to obtain Officer Parrish's personnel file didn't prejudice Kearse.   That's because Kearse "offered no evidence of what or how law enforcement [officers] would have testified at trial had Mr. Udell subpoenaed Officer Parrish's personnel file."

Finally, the district court denied Kearse's claim that his death sentence was cruel and unusual because of his low level of intellectual functioning, his mental and emotional impairments, and his age at the time of the offense.  The district court concluded that the Florida Supreme Court didn't unreasonably apply *Atkins* and *Roper* in rejecting Kearse's constitutional challenge to his death sentence because "there [was] no clearly established federal law which provide[d] that it would be cruel and unusual punishment for someone who is close in age to that of a juvenile and close in

intelligence quotient to someone with mental retardation to be sentenced to death."

Kearse sought leave to appeal, and the district court granted a certificate of appealability on the issue of whether Mr. Udell was ineffective "due to his failure to investigate and prepare for testimony of the [s]tate's mental health expert." We later expanded the certificate to include whether Mr. Udell "unreasonably failed to investigate and present evidence of Officer Parrish's prior misconduct and difficulties dealing with the public" and whether Kearse's death sentence "constitutes cruel and unusual punishment in violation of the Eight and Fourteenth Amendments to the United States Constitution."

## STANDARD OF REVIEW

We review a district court's denial of a section 2254 petition de novo. *Smith v. Comm'r, Ala. Dept' of Corr.*, 924 F.3d 1330, 1336 (11th Cir. 2019). Under the Antiterrorism and Effective Death Penalty Act, federal courts may not grant a section 2254 petition on any claim that was adjudicated on the merits in state court unless the state court's adjudication "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding." 28 U.S.C. § 2254(d)(1)–(2). "[W]e must presume the state court's factual findings to be correct unless the petitioner rebuts that presumption by

clear and convincing evidence." *DeBruce v. Comm'r, Ala. Dep't of Corr.*, 758 F.3d 1263, 1266 (11th Cir. 2014) (citing 28 U.S.C. § 2254(e)(1)); *see Reese v. Sec'y, Fla. Dep't of Corr.*, 675 F.3d 1277, 1287 (11th Cir. 2012) ("[O]ur review of findings of fact by the state court is even more deferential than under a clearly erroneous standard of review." (quotation omitted)).

Our focus under section 2254(d) is on the "last reasoned" state court decision. *McGahee v. Ala. Dep't of Corr.*, 560 F.3d 1252, 1261 n.12 (11th Cir. 2009).  The question is not whether we believe that decision was "incorrect" but whether the decision "was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).  A state court's decision is reasonable "so long as fairminded jurists could disagree on the correctness of the . . . decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quotation omitted).  "If this standard is difficult to meet, that is because it was meant to be." *Id.* at 102.  "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.*  "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* at 102–03 (quotation omitted).  To obtain relief, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

## DISCUSSION

Our review is limited to the three issues in Kearse's certificate of appealability. *Murray v. United States*, 145 F.3d 1249, 1251 (11th Cir. 1998) ("[I]n an appeal brought by an unsuccessful habeas petitioner, appellate review is limited to the issues specified in the [certificate of appealability]."). First, we explain why the Florida Supreme Court did not unreasonably apply *Strickland* in affirming the denial of Kearse's claim that Mr. Udell was ineffective for failing to investigate and prepare for Dr. Martell's testimony. Second, we explain why the Florida Supreme Court did not unreasonably apply *Strickland* in affirming the denial of Kearse's claim that Mr. Udell was ineffective for failing to investigate and present evidence of Officer Parrish's prior misconduct and difficulties dealing with the public. And third, we explain why the Florida Supreme Court did not unreasonably apply *Atkins* and *Roper* in denying Kearse's Eighth Amendment claim that his death sentence was cruel and unusual because he had low-level intellectual functioning, mental and emotional impairments, and was eighteen years old when he murdered Officer Parrish.

### Kearse's Claim That Mr. Udell Was Ineffective in Investigating and Preparing for Dr. Martell's Testimony

As to Kearse's claim that Mr. Udell was ineffective for failing to investigate and prepare for Dr. Martell's testimony, the Florida Supreme Court concluded that Mr. Udell was not deficient because "the evidence show[ed] that [he] correctly anticipated

[Dr.] Martell's testimony." *Kearse*, 969 So. 2d at 986. And the Florida Supreme Court concluded that there was no prejudice to Kearse because he had "not demonstrated anything material that [Mr. Udell] did not anticipate or could have done differently had he deposed Dr. Martell." *Id.* Kearse argues that the Florida Supreme Court unreasonably applied *Strickland*'s performance and prejudice prongs.

### Strickland

Under *Strickland*, "[a] petitioner asserting a claim of ineffective assistance of counsel must demonstrate both deficient performance and prejudice—that counsel's performance 'fell below an objective standard of reasonableness' and that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Hitchcock v. Sec'y, Fla. Dep't of Corr.*, 745 F.3d 476, 485 (11th Cir. 2014) (quoting *Strickland*, 466 U.S. at 687–88). "[T]he failure to demonstrate either deficient performance or prejudice is dispositive of the claim against the petitioner," and "there is no reason for a court deciding an ineffective assistance claim to address both components of the inquiry if the defendant makes an insufficient showing on one." *Windom v. Sec'y, Dep't of Corr.*, 578 F.3d 1227, 1248 (11th Cir. 2009) (alteration adopted) (quoting *Strickland*, 466 U.S. at 697).

The performance inquiry is "highly deferential," and courts must not succumb to the "all too tempting" impulse "to conclude that a particular act or omission of counsel was unreasonable" after counsel's defense "has proved unsuccessful." *Strickland*, 466 U.S.

at 689. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. "No absolute rules dictate what is reasonable performance for lawyers." *Chandler v. United States*, 218 F.3d 1305, 1317 (11th Cir. 2000) (citing *Strickland*, 466 U.S. at 688–89). Instead, "the performance inquiry must be whether counsel's assistance was reasonable considering *all the circumstances*." *Strickland*, 466 U.S. at 688 (emphasis added). In other words, if a reasonably competent attorney in counsel's shoes could—but not necessarily would—have performed the same, then the representation was adequate. *See White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992) ("We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial."); *see also Harrington*, 562 U.S. at 110 ("*Strickland* does not guarantee perfect representation, only a reasonably competent attorney." (quotation omitted)); *Rompilla v. Beard*, 545 U.S. 374, 381 (2005) (referring to "[a] standard of reasonableness applied as if one stood in counsel's shoes").

In reviewing a state court's determination that an attorney's performance was not unreasonable, we decide only whether the state court's conclusion about reasonableness was *itself* reasonable. *See* 28 U.S.C. § 2254(d)(1). We therefore give "both the state court and the defense attorney the benefit of the doubt." *Woods v. Etherton*, 578 U.S. 113, 117 (2016) (quotation omitted). In other words, "because the standards created by *Strickland* and [section] 2254(d) are both highly deferential," our review is "doubly"

deferential "when the two apply in tandem." *Jenkins v. Comm'r, Ala. Dep't of Corr.*, 963 F.3d 1248, 1265 (11th Cir. 2020) (alteration adopted and quotation omitted).

The prejudice inquiry doesn't ask whether "the errors had some conceivable effect on the outcome of the proceeding." *See Strickland*, 466 U.S. at 693. Instead, "the prejudice inquiry asks 'whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Hitchcock*, 745 F.3d at 485 (quoting *Strickland*, 466 U.S. at 695).

### Deficiency

Kearse argues that the Florida Supreme Court unreasonably applied *Strickland*'s performance prong because Mr. Udell: (1) didn't depose Dr. Martell, didn't attend Dr. Martell's evaluation of Kearse, and thus "had no idea what Dr. Martell was going to say"; and (2) didn't adequately prepare Kearse's expert witnesses to rebut Dr. Martell's opinions. But we can't say that the Florida Supreme Court's conclusion that Mr. Udell performed reasonably under the circumstances is beyond any possibility for fairminded disagreement.

The record shows that, with the limited time the state trial court gave him to prepare, Mr. Udell investigated Dr. Martell's testimony and knew what he was going to say at resentencing. Mr.

Udell testified that he knew what Dr. Martell was going to say either because he read Dr. Martell's report or because he had informal conversations with Dr. Martell or the state attorney before Kearse's resentencing.  Dr. Martell also thought that he and Mr. Udell might've had "an informal conversation about the scope of [his] testimony before [he] took the stand."  And Mr. Udell said that he would've investigated Dr. Martell's background by "ask[ing] the lawyers that [he] kn[e]w who had been doing this kind of work for many years" if they knew of Dr. Martell.  Mr. Udell also attended Dr. Martell's examination of Kearse and only left after Dr. Martell said that he preferred to do the examination alone with Kearse.  Mr. Udell sent the results of Dr. Martell's examination to Kearse's experts and Mr. Udell "knew going into trial exactly what Dr. Martell was going to say as to which statutory aggravators and/or mitigators existed, and what his test results supposedly revealed, and where he disagreed with Dr. Petrilla."

In addition to Mr. Udell's testimony at the postconviction hearing, his cross-examination of Dr. Martell at resentencing showed that Mr. Udell knew what Dr. Martell was going to say. For example, Mr. Udell was ready to challenge Dr. Martell's opinion that Kearse didn't have fetal alcohol effect by getting Dr. Martell to admit that a mother drinking alcohol while pregnant could cause significant detrimental effects on her child and lead to brain dysfunction.  He drove that point home by having Dr. Martell admit that, if his wife were pregnant, he wouldn't want her to drink alcohol like Kearse's mother had.  Mr. Udell also highlighted that

Dr. Martell hadn't studied the effects of alcohol on animals or practiced neuropharmacology.

Mr. Udell was also ready to challenge Dr. Martell's opinion that Kearse was capable of conforming his conduct to the requirements of the law by: (1) getting Dr. Martell to admit that he "hadn't thought about" when Kearse had formed the intent to kill Officer Parrish; and (2) highlighting facts that contradicted Dr. Martell's opinion that Kearse was determined to avoid arrest—including that Kearse was unarmed when Officer Parrish pulled him over and that Kearse confessed that he killed Officer Parrish as soon as he met with police.

And Mr. Udell prepared Kearse's expert witnesses to rebut Dr. Martell's opinions. Despite the state trial court's denials of his motions to continue resentencing and the fact that he only had the data from Dr. Martell's examination for three days before resentencing, Mr. Udell gave Dr. Martell's data to his experts who provided testimony that rebutted Dr. Martell's opinions. For example, Mr. Udell used Dr. Lipman to relay Dr. Levine's opinion that Dr. Martell's test results showed that Kearse's intellectual functioning was not where it should be. Mr. Udell also used Dr. Lipman to rebut Dr. Martell's opinion that Kearse was malingering by relaying Dr. Friedman's opinion that Kearse's F Scale results did not show that Kearse was malingering. And Mr. Udell similarly used Dr. Petrilla's opinion that Kearse's elevated F Scale did not indicate malingering to rebut Dr. Martell's opinion that Kearse was malingering. As the state postconviction court noted, it was "evident . . .

from Dr. Petrilla's and Dr. Lipman's testimony during [resentencing] that [Mr.] Udell anticipated that Kearse's personality profile would be at issue, particularly with respect to any indication of malingering."

Kearse contends that Mr. Udell's decision not to depose Dr. Martell and to instead rely on informal conversations with Dr. Martell or the state attorney "can hardly suffice for the purposes of defending a capital case" and "[was] not a strategy." But there is no categorical rule requiring defense attorneys to depose a witness in a criminal case. Neither Alabama[5] nor Georgia[6] routinely permit

---

[5] "There is no constitutional right to discovery in a criminal case in Alabama." *Ex parte State*, 287 So. 3d 384, 394 (Ala. 2018) (quotation omitted). Depositions may be taken in criminal cases only by court order under "exceptional circumstances" pursuant to a motion of the party offering the witness, Ala. R. Crim. P. 16.6(a); *see also* Ala. Code § 12-21-264, or by agreement of the parties and with consent of the court, Ala. R. Crim. P. 16.6(g).

[6] In Georgia, "[n]o broad right of discovery exists . . . in criminal cases; the common law recognized no right of discovery in such cases, and it has been held that unless introduced by appropriate legislation, the doctrine of discovery is a complete and utter stranger to criminal procedure." *See Sears v. State*, 356 S.E.2d 72, 76 (Ga. Ct. App. 1987) (quotation omitted), *overruled on other grounds by State v. Lane*, 838 S.E.2d 808 (Ga. 2020). Although criminal defendants have a right to interview a state witness before trial, that right is subject to the witness's consent. *See id.* Depositions may be taken in criminal cases only by court order under certain limited circumstances, *see* Ga. Code Ann. § 24-13-130, or by agreement of the parties and with consent of the court, *see id.* § 24-13-138; *see also Evans v. State*, 503 S.E.2d 344, 346–37 (Ga. Ct. App. 1998) ("The General Assembly has prohibited trial courts from ordering depositions in criminal cases except in several specific situations . . . .").

depositions in criminal cases, and we don't understand Kearse to argue that every criminal defense attorney in those states provides ineffective assistance of counsel. As Kearse's own expert testified, the decision to depose the state's expert would be "within the tactical and strategic province of the attorney" and "would vary from case to case." Kearse's expert also said that an attorney could decide against deposing an expert because there may be things "you don't want the other side to know about."

That was Mr. Udell's strategy here. Mr. Udell explained that he was a "firm believer of doing very little discovery on the record in the presence of the [s]tate [a]ttorney" because "[e]very time you take a deposition, they learn one thing about your case that but for your deposition they wouldn't have known." So, instead of deposing Dr. Martell, Mr. Udell learned what Dr. Martell was going to say by speaking informally with the state attorney or Dr. Martell, talking with lawyers in the community, and consulting his experts. And by not taking the deposition, he avoided divulging details about the defense. We can't say that no fairminded jurist could conclude, as the Florida Supreme Court did, that Mr. Udell reasonably decided not to depose Dr. Martell. *See Messer v. Florida*, 834 F.2d 890, 896–97 (11th Cir. 1987) (concluding that defense counsel's decision not to depose the pathologist who performed an autopsy on the victim wasn't "outside the wide range of professionally competent assistance" where "[t]he defense counsel testified in state court that he had full access to the prosecutor's files, which presumably included the pathologist's report" (quotation omitted));

*Turner v. Williams*, 35 F.3d 872, 898 (4th Cir. 1994) (concluding that defense counsels' failure to depose the state's witnesses wasn't deficient where, "from their conversations with the prosecutor, [defense counsel] were aware of the substance of the witnesses' anticipated testimony"), *overruled on other grounds by O'Dell v. Netherland*, 95 F.3d 1214 (4th Cir. 1996); *Eggleston v. United States*, 798 F.2d 374, 376 (9th Cir. 1986) ("A claim of failure to interview a witness may sound impressive in the abstract, but it cannot establish ineffective assistance when the person's account is otherwise fairly known to defense counsel." (quoting *United States v. Decoster*, 624 F.2d 196, 209 (D.C. Cir. 1976) (en banc))).

Kearse also asserts that Mr. Udell "did not attend Dr. Martell's evaluation of Kearse, despite having argued [to the state trial court] that it was necessary to do so." But Kearse's expert testified that whether to attend the state's expert's evaluation "would be a tactical and strategic decision by the attorney." And Mr. Udell did attend Dr. Martell's examination of Kearse. Dr. Martell told Mr. Udell that he preferred to conduct the examination alone with Kearse. Mr. Udell honored that request, but only after he got Dr. Martell to question Kearse about the facts of the murder so that Mr. Udell could object on the record to that part of the examination.

Finally, Kearse argues that Mr. Udell failed to adequately prepare his expert witnesses to rebut Dr. Martell's opinions. But, as we've already explained, the record shows that Mr. Udell

prepared Dr. Lipman and Dr. Petrilla to rebut Dr. Martell's opinion that Kearse was malingering.

Under our "doubly" deferential standard of review, we can't say that the Florida Supreme Court unreasonably concluded that Mr. Udell's performance was reasonable under the circumstances. *See Jenkins*, 963 F.3d at 1265. Because the Florida Supreme Court did not unreasonably apply *Strickland*'s performance prong, we don't need to address the prejudice prong because Kearse's failure to show deficient performance is "dispositive." *Windom*, 578 F.3d at 1248; *see Ledford v. Warden, Ga. Diagnostic Prison*, 975 F.3d 1145, 1160 (11th Cir. 2020) ("We cannot . . . disturb the state habeas court's conclusion that trial counsel's performance was not deficient, and we have no need to consider whether counsel's actions prejudiced [the petitioner's] defense.").

### *Kearse's Claim That Mr. Udell Was Ineffective in Failing to Investigate and Present Evidence of Officer Parrish's Prior Misconduct and Difficulties Dealing with the Public*

As to Kearse's claim that Mr. Udell was ineffective for failing to investigate and present evidence of Officer Parrish's prior misconduct and difficulties dealing with the public, the Florida Supreme Court concluded that Mr. Udell's decision not to vilify Officer Parrish was a reasonable strategic choice and that Kearse had "not demonstrated prejudice from [Mr. Udell's] failure to obtain the personnel record." *Kearse*, 969 So. 2d at 986. Kearse argues that Mr. Udell was "deficient in two respects": (1) he failed to investigate all of the complaints against Officer Parrish and to call any

witnesses who had filed complaints to testify about their negative experiences with Officer Parrish; and (2) he "neglected to obtain Officer Parrish's complete personnel file," which "indicated numerous deficiencies in Officer Parrish's job performance that were relevant to the issues presented in Kearse's case." The Florida Supreme Court decided the first part of this challenge on *Strickland*'s performance prong and the second part on the prejudice prong. *See id.* We conclude that the Florida Supreme Court didn't unreasonably determine that Mr. Udell made an informed strategic decision not to call citizen complainants to testify, and that Kearse wasn't prejudiced by Mr. Udell's failure to obtain Officer Parrish's personnel file.

### Mr. Udell's failure to investigate and present evidence of citizen complaints against Officer Parrish

Kearse argues that Mr. Udell "tried to pass his negligence [in not presenting evidence of citizen complaints against Officer Parrish] as a 'strategy decision.'" According to Kearse, Mr. Udell "did not have the information necessary to make a 'strategic decision' to abandon this defense" because he "fail[ed] to investigate and present evidence of several formal complaints against Officer Parrish, and others who [Officer Parrish] had threatened but did not make formal complaints." But it wasn't unreasonable for the Florida Supreme Court to find that Mr. Udell made an informed strategic decision. *See Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc) ("Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will

seldom, if ever, second guess."). That's exactly what Mr. Udell testified to: that he had made an "educated strategy decision." And Kearse has failed to prove—let alone by clear and convincing evidence—that the Florida Supreme Court's determination was unreasonable or incorrect. *See* 28 U.S.C. § 2254(d)(2), (e)(1); *Kimbrough v. Sec'y, DOC*, 565 F.3d 796, 804 (11th Cir. 2009) ("[A] state court's determination that a decision of counsel is 'tactical' is a question of fact that we review under a clear and convincing evidence standard.").

Mr. Udell investigated the citizen complaints and decided the evidence was unhelpful. Mr. Udell requested and received copies of citizen complaints that had been filed against Officer Parrish and he and Investigator Evans interviewed some of the citizens who had negative encounters with Officer Parrish. For example, Mr. Pullen and Mr. Jones testified that they met with Mr. Udell before Kearse's trial. But Mr. Pullen had never filed a complaint against Officer Parrish, had been "arrested twenty times," and had been in and out of jail. And Mr. Jones said that he "would not have wanted" to testify in Kearse's trial. Another complainant had "called [Officer Parrish] a pinhead and used the F word" and his wife later described his conduct as being more offensive than Officer Parrish's. Mr. Udell recognized that if he introduced any of the complaints, the state would have undermined them by faulting the complainants' actions and introducing evidence that the police department found the complaints not credible.

Based on his review of the complaints in the Fort Pierce Police Department's file, and having interviewed some of the complainants, Mr. Udell made an "educated strategy decision" not to have any of the witnesses testify about their encounters with Officer Parrish because "it would['ve] be[en] more harmful than helpful." This wasn't an unreasonable strategic decision because a vilification strategy would've been contrary to Mr. Udell's mitigation strategy, his understanding of Indian River County jurors' views on law enforcement, and the facts and circumstances of Kearse's case.

First, blaming Officer Parrish would've worked against Mr. Udell's strategy at resentencing of establishing statutory and non-statutory mental health mitigation. Mr. Udell rebutted the state's closing argument by conceding that no one was to blame other than Kearse:

> [The state] told you a lot about what I'm going to tell you. You listen to what I have to tell you and see if I blame anybody. There's nobody to blame but Billy Kearse. He's the only person on trial here. You're not going to hear me blame [Kearse's mother] or blame the school system or blame [Officer Parrish]. I'm certainly not going to try and minimize his responsibility. He's here, isn't he? He's been convicted of first degree murder. The only question is, does he live the rest of his life in prison or do we execute him? There's no minimalizing responsibility, not from me, I promise you that.

Mr. Udell also focused on the reasonableness of Officer Parrish's actions to emphasize how Kearse's mental disabilities caused him to react to situations differently than normal people:

> No doubt [Officer Parrish] had every right to be mad. He gave him every chance he could. Let's think about where he was coming from and, therefore, what his attitude and what he was conveying to [Kearse]. After getting jerked around for about [twenty] minutes he'd had it. You would too. And I believe it's true, I think the evidence supports it, that he said to [Kearse], get out of the car. What was it . . . [Pendleton] said he said? If you just tell me that your license is suspended, I'll give you a couple citations and let you go. The normal person would have done that. But that's [Kearse]. He don't [sic] understand. He doesn't reason like you do or I do.

Mr. Udell would've undermined his strategy of showing that Kearse murdered Officer Parrish because of Kearse's severe emotional impairments, poor judgment, brain damage, impulsivity, and inability to reason abstractly had Mr. Udell tried to shift blame to Officer Parrish by calling witnesses to testify about their negative encounters with him. *See Tharpe v. Warden*, 834 F.3d 1323, 1343 (11th Cir. 2016) ("[Trial counsel] sought to portray Tharpe as a good guy who made a mistake at an emotionally fraught time but who nonetheless deserved the jury's mercy. The efficacy of that approach may well have been diminished had [trial counsel] simultaneously presented testimony portraying Tharpe as an alcoholic

with low intellectual functioning and a troubled past. Instead of crediting Tharpe's unfortunate circumstances as making him less culpable in the murder . . . , the jury could have concluded instead that Tharpe was not willing to accept responsibility for his actions, thus sinking Tharpe's credibility and undermining both the good-character defense and the diminished-capacity defense.").

Second, Mr. Udell knew from experience that a strategy of blaming Officer Parrish wouldn't have played well with the jury. Mr. Udell understood that jurors in Indian River County were different than jurors in "New York, Philly, Boston, even West Palm Beach"—they "believe[d] in the integrity of law enforcement" and wouldn't be receptive to attacks on Officer Parrish's character. He also knew that the jury wouldn't place great emphasis on the complaints against Officer Parrish because police officers were often subject to complaints. In other words, Mr. Udell concluded that blaming Officer Parrish for his own murder was likely to backfire. *See, e.g.*, *Black v. Workman*, 682 F.3d 880, 904 (10th Cir. 2012) ("Any effort by counsel to blame the victims would be as likely to backfire as to diminish [the defendant]'s culpability in the jury's eyes."); *Defazio v. Sweeney*, 2019 WL 981646, at *7 (D.N.J. Feb. 28, 2019) ("[R]easonable counsel could have perceived that pursuing . . . a blame-the-victim strategy[] before the jury could have seriously backfired."); *Howell v. State*, 877 So. 2d 697, 703 (Fla. 2004) ("[A] concern about being perceived as blaming the victim for his or her own death is a valid reason for declining to introduce particular evidence.").

And third, Mr. Udell determined that a victim-blaming strategy wasn't possible under the facts and circumstances of Kearse's case. At Kearse's trial, Pendleton—Kearse's passenger on the night of the murder—testified that Officer Parrish said he would let Kearse go if Kearse gave him his real name and that Officer Parrish hadn't abused Kearse "in any way." Pendleton testified that when she asked Kearse why he shot Officer Parrish, Kearse "said that his probation was suspended and the police were looking for him already." Mr. Udell could have reasonably concluded that blaming Officer Parrish wouldn't have worked because of the evidence that Officer Parrish wasn't hostile or abusive toward Kearse. *See Freund v. Butterworth*, 165 F.3d 839, 866–69 (11th Cir. 1999) (en banc) (rejecting the argument that counsel could've pursued an alternative strategy of shifting the blame to the codefendant because the strategy was "not realistic in view of the uncontradicted testimony of the eyewitnesses"); *Oliver v. Wainwright*, 782 F.2d 1521, 1525 (11th Cir. 1986) (rejecting the argument that counsel could've pursued an alternative strategy of shifting the blame to the codefendant—"the alternative strategy . . . was not an option available to trial counsel because the facts d[id] not support the theory").

Kearse argues that Mr. Udell was deficient for not "conducting a complete investigation of Officer Parrish's conduct." But Mr. Udell obtained every citizen complaint that had been filed against Officer Parrish. After reviewing the complaints, Mr. Udell and Investigator Evans interviewed "some" of those citizens, including Mr. Jones, who didn't want to testify, and the citizen who called

Officer Parrish a "pinhead" and used the "F word." Mr. Udell even contacted Mr. Pullen, who had not filed a complaint with the Fort Pierce Police Department, to learn about his negative encounter with Officer Parrish. But Mr. Pullen had been arrested twenty times, had been in and out of jail, and hadn't filed a complaint despite claiming to have been handcuffed to a tree and bitten by red ants. *Strickland* did not require Mr. Udell to "leave no stone unturned and no witness unpursued." *Raulerson v. Warden*, 928 F.3d 987, 997 (11th Cir. 2019) (quotation omitted). *Strickland*, instead, required a reasonable investigation under the circumstances, *see Sullivan v. Sec'y, Fla. Dep't of Corr.*, 837 F.3d 1195, 1204–05 (11th Cir. 2016) ("Counsel's investigation does not fall below *Strickland*'s standard so long as a reasonable lawyer could have decided, under the circumstances, not to investigate particular evidence." (alterations adopted and quotation omitted)), and that is what Mr. Udell did. Once he reviewed every complaint in the Fort Pierce Police Department's file, found additional complaining witnesses, and talked to them about their negative experiences with Officer Parrish—in other words, after he conducted a reasonable investigation under the circumstances—Mr. Udell made a strategic decision not to go with a blame-the-victim strategy that was inconsistent with the mental health mitigation, would have tuned out the jury, and wasn't supported by the evidence. The Florida Supreme Court did not unreasonably apply *Strickland* in determining that Mr. Udell was not deficient for making that strategic decision. *See Nance v. Warden, Ga. Diagnostic Prison*, 922 F.3d 1298, 1302 (11th Cir. 2019) ("It is especially difficult to succeed with an ineffective

assistance claim questioning the strategic decisions of trial counsel who were informed of the available evidence.").

### Mr. Udell's failure to obtain Officer Parrish's personnel file

Kearse argues that Mr. Udell's failure to obtain Officer Parrish's personnel file prejudiced him because the evidence it contained would have, "[a]t a minimum, . . . contributed to Kearse's mitigation case" and that "there is, at the very least, a reasonable probability that . . . the result of the proceedings would have been different." But the Florida Supreme Court determined that Kearse wasn't prejudiced by the failure to get the personnel file because "any evidence in the file supporting the vilification mitigation could have been countered at trial by other evidence in it of Officer Parrish's good reports and commendations." *Kearse*, 969 So. 2d at 986. The Florida Supreme Court's prejudice determination wasn't an unreasonable application of *Strickland*.

The Florida Supreme Court's prejudice finding wasn't unreasonable because Officer Parrish's personnel file would have undermined a blame-the-victim strategy. The personnel file contained evidence that Officer Parrish was an outstanding police officer. He had a "Memorandum of Commendation," which recognized Officer Parrish's heroism in "helping a juvenile that was threatening suicide and d[e]fus[ing] the situation." And the personnel file had performance evaluations that rated Officer Parrish's "meeting and dealing with the public" as "satisfactory," described Officer Parrish as "an asset to the police department" who was "always working a hundred percent on the streets," and noted that

Officer Parrish "donat[ed] time to serve on the Honor Guard." Had Mr. Udell obtained the personnel file and introduced it into evidence, the state would've used the positive material about Officer Parrish to rebut any claims of misconduct.

The Florida Supreme Court's prejudice determination also wasn't unreasonable because the facts of Kearse's case didn't fit a blame-the-victim strategy. As Kearse's expert testified, a police officer's personnel file's relevance would depend on whether there was a dispute about the police officer being the aggressor. And here, there was no evidence that Officer Parrish was the aggressor. The uncontradicted testimony from Pendleton was that Officer Parrish hadn't mistreated Kearse. She testified that Officer Parrish said he would let Kearse go if Kearse gave him his real name, that Officer Parrish hadn't abused Kearse "in any way," and that Kearse told her that he shot Officer Parrish because "his probation was suspended and the police were looking for him already," not because of anything Officer Parrish did.

Because the personnel file contained evidence that would've undermined a blame-the-victim strategy, and because there was no evidence that Officer Parrish mistreated Kearse, the Florida Supreme Court didn't unreasonably apply *Strickland* when it determined that there was no reasonable probability of a different result had Mr. Udell obtained Officer Parrish's personnel file.

*Kearse's Claim That His Death Sentence Constitutes Cruel and Unusual Punishment in Violation of the Eighth and Fourteenth Amendments*

The Florida Supreme Court concluded that Kearse's death sentence was constitutional under *Atkins* and *Roper* because he was neither intellectually disabled nor younger than eighteen at the time of the murder. *Kearse*, 969 So. 2d at 981, 990–92. Kearse argues that the Florida Supreme Court unreasonably applied *Atkins* and *Roper* because it "only viewed this matter in light of numbers" and "all of[] the Eighth Amendment concerns discussed in *Atkins* and *Roper* are equally applicable to Kearse."[7] We disagree.

"A decision is 'contrary to' clearly established federal law if the state court applied a rule that contradicts governing Supreme Court precedent, or if it reached a different conclusion than the Supreme Court did in a case involving materially indistinguishable facts." *James v. Warden*, 957 F.3d 1184, 1190 (11th Cir. 2020) (citing *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000)). "A state court decision involves an 'unreasonable application' of clearly established federal law if the court identifies the correct legal principle

---

[7] Although Kearse argues that the Florida Supreme Court "misconstrued" and "misse[d] the gravamen" of this claim, he concedes that the claim is subject to deference under the Antiterrorism and Effective Death Penalty Act. Indeed, rather than arguing the issue de novo, he specifically argues that the Florida Supreme Court's decision was "contrary to and an unreasonable application of *Atkins* . . . , *Roper* . . . , and the Eighth Amendment." Like Kearse, we focus only on whether the Florida Supreme Court's decision was contrary to, or an unreasonable application of, *Atkins* and *Roper* as required by section 2254(d).

but applies it unreasonably to the facts before it." *Id.* In either case, the phrase "clearly established federal law" refers to the Supreme Court's "holdings." *See Williams*, 529 U.S at 412. "In other words, 'clearly established Federal law' under [section] 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003).

In *Atkins*, the Supreme Court "held that the Eighth Amendment prohibits the imposition of a death sentence on a defendant who is 'mentally retarded.'" *Shoop v. Hill*, 139 S. Ct. 504, 506 (2019); *see also Hill v. Humphrey*, 662 F.3d 1335, 1360 (11th Cir. 2011) (en banc) ("*Atkins* established *only* a substantive Eighth Amendment right for the mentally retarded . . . ."). Kearse concedes that he "does not meet the diagnostic criteria for 'mental retardation' or 'intellectual disability' as understood in *Atkins*." And, although he says that "given his mental impairments, in conjunction with his youth at the time of the offense, the reasons for excluding mentally retarded individuals from the death penalty apply equally to [him]," we've explained that "a constitutional rule exempting the 'functionally mentally retarded' from execution would go beyond the holding of *Atkins*, something this [c]ourt may not do when reviewing [section] 2254 petitions." *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1369 (11th Cir. 2009).

In *Roper*, the Court "held that the Eighth Amendment prohibits capital punishment for those under the age of 18 at the time of their crimes." *Montgomery v. Louisiana*, 577 U.S. 190, 206

(2016); *see also Loggins v. Thomas*, 654 F.3d 1204, 1221–22 (11th Cir. 2011) ("The holding of *Roper* is simply that the Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed." (alteration adopted and quotation omitted)).  Kearse admits that he was over the age of 18 when he murdered Officer Parrish, but he argues that "all the criteria in *Roper* apply to him" and urges us to consider "the spirit of *Roper*."  But whatever the "spirit" of *Roper* may be, "the Supreme Court has held that for [section] 2254(d)(1) purposes, only the holdings of its decisions matter."  *Loggins*, 654 F.3d at 1224.  "A rationale is not a holding any more than a road is a destination," and "[b]ecause implications are not actual holdings, the implications of Supreme Court decisions cannot clearly establish federal law for [section] 2254(d)(1) purposes."  *Id.* at 1222, 1224.  In short, the Florida Supreme Court correctly identified the Supreme Court's holdings in *Atkins* and *Roper* and reasonably applied them to the facts of this case.

This is not a case, as Kearse argues, in which a state court "unreasonably refuse[d] to extend [a legal] principle to a new context where it should apply."  *Williams*, 529 U.S. 407.  In *Atkins*, the Supreme Court drew a bright line at "mental retardation."  *See* 536 U.S. at 317.  In *Roper*, the Supreme Court drew a bright line at the age of 18.  *See* 543 U.S. at 574 ("The age of 18 is the point where society draws the line for many purposes between childhood and adulthood.  It is, we conclude, the age at which the line for death eligibility ought to rest.").  There was no general legal principle for

the Florida Supreme Court to extend because *Atkins* and *Roper* established categorical rules. *See Graham v. Florida*, 560 U.S. 48, 60–61 (2010) (citing *Atkins* and *Roper* as examples of cases in which the Supreme Court "has used categorical rules to define Eighth Amendment standards"). For example, a defendant is either eighteen years old at the time he commits the murder, or he is not. Moving the *Roper* line to eighteen years and a few months does not extend the categorical rule; it violates it.

We held as much in *Barwick v. Secretary, Florida Department of Corrections*, 794 F.3d 1239 (11th Cir. 2015). There, the petitioner argued that his death sentence was unconstitutional because, although he was nineteen-and-a-half years old at the time of his offense, "his mental functioning was equivalent to that of an ordinary 11-to-13-year-old person" and "his intellectual functioning [was] equivalent to that of an ordinary 12-to-14-year-old person." 794 F.3d at 1257. In other words, he argued that "sentencing to death one who has reached the chronological age of legal maturity but who possesses the mental and intellectual capabilities of a juvenile would be unconstitutional." *Id.* at 1258.

We rejected the petitioner's argument because he failed to show that the state court's denial of his claim was contrary to or an unreasonable application of clearly established federal law. *Id.* at 1258–59. In doing so, we agreed with the district court's analysis that "the [Supreme Court] ha[d] not extended *Roper* to mental or emotional age" and that *Roper* "drew a bright line" at age 18. *Id.* We also agreed that "[a] reasonable application of *Roper* is that the

bright line works the other way, too—executing an individual for committing a crime after age 18 is not, just because of age, unconstitutional[; m]ental or emotional age may be a mitigating factor, but it does not necessarily preclude the death penalty." *Id.*

Because "state courts are not obligated to extend legal principles set forth by the Supreme Court," we couldn't say that the state court unreasonably applied clearly established federal law when it denied the *Barwick* petitioner's claim. *Id.* at 1259; *see also Shore v. Davis*, 845 F.3d 627, 633–34 (5th Cir. 2017) (defendant's claim "that his execution would be cruel and unusual in light of his brain injury" did "not rely on the holding of any Supreme Court precedent but instead [sought] to extend the reasoning of *Atkins* . . . and *Roper*"). By the same token, we can't say that the Florida Supreme Court unreasonably applied clearly established federal law in denying Kearse's claim.

We end with a few words about the dissenting opinion. The dissenting opinion says that we, and the Florida Supreme Court, have misconstrued Kearse's Eighth Amendment claim. "The heart of Kearse's argument," the dissenting opinion explains, was a "proportionality claim." Dissenting Op. at 4. In the dissenting opinion's view, Kearse argued "for individual, proportionality-based relief, not for a categorical, bright-line exemption based on his age or intellectual ability." *Id.* at 5 n.5.

But Kearse didn't raise a proportionality claim. He didn't raise a proportionality claim in the Florida Supreme Court. And he didn't raise one here.

In the part of his habeas petition to the Florida Supreme Court arguing that his death sentence was a cruel and unusual punishment, Kearse never used the word "proportional" or "proportionality." *See* Petition for Writ of Habeas Corpus, Kearse v. State, 969 So. 2d 976 (Fla. 2007) (Nos. SC05–1876, SC06–942), 2006 WL 1463594, at *24–*35. Not once.[8] Instead, Kearse argued that his "low level of intellectual functioning and mental and emotional impairments, in combination with his age at the time of the offense (eighteen and three months), render[ed] him *categorically* less culpable than the average criminal." *Id.* at *24 (emphasis added and quotation omitted).

In the part of his initial brief arguing that his death sentence was a cruel and unusual punishment under the Eighth Amendment, Kearse never used the word "proportional" or any derivative of it. Not one time.[9] Instead, Kearse argued that his "low level of intellectual functioning and mental and emotional impairments, in combination with his age at the time of the offense (eighteen and 84 days), render[ed] him *categorically* less culpable than the

---

[8] Kearse quoted *Atkins*, once, using the word "proportioned" and cited *Roper* for its holding that the death penalty is a "disproportionate" punishment for juveniles. *See* Petition for Writ of Habeas Corpus, 2006 WL 1463594, at *26, *31. But those references are *Atkins*- and *Roper*-specific. Neither one of them argued for a non-categorical holding that it violates the Eighth Amendment to sentence Kearse to death given the specific facts of this case, which fall outside the holdings of those two decisions.

[9] Kearse cut and pasted the same quote from *Atkins* and the same description of *Roper*'s holding from his habeas petition to the Florida Supreme Court.

average criminal." And, in his reply brief, Kearse didn't use the term "proportionality" a single time or any word related to it. Not even a third cousin. Instead, Kearse argued that the "rationale" of *Atkins* and *Roper* should "extend equally to" him. But we rejected that argument in *Barwick*. *See Barwick*, 794 F.3d at 1259 ("[S]tate courts are not obligated to extend legal principles set forth by the Supreme Court . . . .").

We don't see how the "heart" of his Eighth Amendment argument could have been a "proportionality claim," as the dissenting opinion suggests, when Kearse never uses the word "proportionality." And we don't see how the dissenting opinion can say that Kearse didn't argue "for a categorical, bright-line exemption based on his age or intellectual ability." That's exactly what he argued to the Florida Supreme Court and to us: that he is "*categorically* less culpable than the average criminal" because of his "low level of intellectual functioning and mental and emotional impairments, in combination with his age at the time of the offense" and that we should "extend" *Atkins* and *Roper* to eighteen-year-olds with borderline intelligence. And that's the claim that we, and the Florida Supreme Court, addressed. The one Kearse actually raised.

In any event, even if Kearse had raised a proportionality claim, the Florida Supreme Court did not unreasonably apply clearly established law. The United States Supreme Court has never held that the death penalty was not a proportional punishment for an eighteen-year-old with borderline intelligence and emotional problems who, during a traffic stop, takes a police

officer's gun and shoots him thirteen times (while the officer is begging for his life) because the shooter is on probation and doesn't want to go back to jail. Without a clearly established holding from the United States Supreme Court, there was nothing for the Florida Supreme Court to unreasonably apply. *See Reese*, 675 F.3d at 1288 ("[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by the Supreme Court." (alteration adopted and quotation omitted)).

## CONCLUSION

"Section 2254(d) reflects the view that habeas corpus is a guard against *extreme malfunctions in the state criminal justice systems*, not a substitute for ordinary error correction through appeal." *Harrington*, 562 U.S. at 102–03 (quotation omitted and emphasis added). There was no extreme malfunction in this case. The Florida Supreme Court's application of *Strickland*, *Atkins*, and *Roper* were not "beyond any possibility for fairminded disagreement." *See id.* at 103. Section 2254(d) requires that federal habeas relief be denied and that we affirm that denial.

**AFFIRMED.**

15-15228 WILSON, J., Concurring in part and Dissenting in part    1

WILSON, Circuit Judge, Concurring in part and Dissenting in part:

I concur with the majority on Kearse's ineffective assistance claims.[1] But I dissent as to Kearse's Eighth Amendment claim because the Florida Supreme Court unreasonably applied clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).

Three justices of the Florida Supreme Court said it best: "The bottom line is that this is clearly not a death case." *Kearse v. State*, 770 So. 2d 1119, 1138 (Fla. 2000) (Anstead, J., dissenting) (analyzing proportionality under Florida law). The bottom line is the same under federal law. You need not be an Eighth Amendment scholar to see why:

> [T]he killing resulted from the impulsive act of an eighteen-year-old [Kearse] who functions on a low average-borderline intelligence level and has a documented history of emotional problems. Importantly,

---

[1] However, I am skeptical of the Florida Supreme Court's application of *Strickland* to the ineffective assistance claim regarding Dr. Daniel Martell. As the majority notes, Kearse's counsel chose not to depose Dr. Martell but spoke informally to Dr. Martell and the state attorney along with other lawyers in the community and his experts. Although I think no competent counsel with a 9-day window of opportunity would have failed to depose the only state mental health expert in a death case that turned on mental health mitigation, that is not what *Strickland* requires. Rather, "the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). Considering what *Strickland* requires and our "doubly" deferential standard of review, I reluctantly concur with the majority on this claim.

2    WILSON, J., Concurring in part and Dissenting in part    15-15228

> there is no evidence that Kearse set out that night in-
> tending to commit any crime, let alone murder.  In
> fact, he had just picked up a pizza and was returning
> home to eat it with friends when this tragic incident
> took place.

*Id.* at 1136.

If that much was clear in 2000, when the Florida Supreme Court considered the proportionality of Kearse's sentence under Florida law, then it was certainly clear in 2007, when the same court purportedly addressed Kearse's Eighth Amendment claim. The court held that Kearse's death "sentence is not unconstitutional under *Atkins*" because he is "not mentally retarded," and that "Kearse does not qualify for exemption from execution under *Roper*" because he was eighteen at the time of his crime. *Kearse v. State*, 969 So. 2d 976, 991–92 (Fla. 2007) (per curiam).  But—as Kearse points out—that's not what he argued,[2] and those two cases are not the be-all and end-all of the Supreme Court's Eighth

---

[2] Kearse has consistently and specifically argued that the Florida Supreme Court misconstrued his state habeas Eighth Amendment claim in a legally significant way—unlike the petitioner in *Barwick v. Secretary, Florida Department of Corrections*, 794 F.3d 1239 (11th Cir. 2015) (per curiam).  As the State of Florida notes in a supplemental authority letter, in *Barwick*, we rejected a similar Eighth Amendment habeas claim.  *Id.* at 1257–59.  But there the petitioner never argued that the Florida Supreme Court misconstrued his petition at all, much less in a legally significant way.  Therefore, our holding that the Florida Supreme Court did not unreasonably apply clearly established law in *Barwick* has no bearing here.  *See id.*

15-15228 WILSON, J., Concurring in part and Dissenting in part    3

Amendment precedent. Case-by-case proportionality remains the Eighth Amendment's polestar.

The court failed to analyze whether Kearse's death sentence was proportional or unconstitutionally excessive given the facts of his case. But it should have. Kearse so argued, and as of 2007, Supreme Court precedent called for such an analysis. *See, e.g.*, *Enmund v. Florida*, 458 U.S. 782, 788–801 (1982) (analyzing a death sentence for proportionality under the Eighth Amendment's Cruel and Unusual Punishments Clause, with discussion of retribution and deterrence); *see also Lockyer v. Andrade*, 538 U.S. 63, 72–73 (2003) (holding that a "gross disproportionality principle" is clearly established Eighth Amendment law for analyzing a sentence for a term of years under § 2254(d)(1)); *Solem v. Helm*, 463 U.S. 277, 284–303 (1983) (analyzing a sentence of life without possibility of parole for proportionality under the Eighth Amendment).[3]

---

[3] In its supplemental authority letter, the State of Florida draws our attention to *Pulley v. Harris*, 465 U.S. 37, 44–51 (1984), and argues that there "the Supreme Court explained that a proportionality review is merely an 'additional safeguard against arbitrarily imposed death sentences,' but not one of constitutional necessity." But the State misapprehends *Pulley*; in fact, the case proves my point. *Pulley* describes two types of proportionality review. *Compare id.* at 42–43 (describing "traditional" proportionality review "of the appropriateness of a sentence for a particular crime") *with id.* at 43–44 (describing a "different sort" of proportionality review where a court "presumes that the death sentence is not disproportionate to the crime in the traditional sense" and "purports to inquire instead whether the penalty is nonetheless unacceptable in a particular case because disproportionate to the punishment imposed on others convicted of the same crime"). The point of my dissent is that

4   WILSON, J., Concurring in part and Dissenting in part   15-15228

The majority disagrees that more analysis was required.  It says that Kearse framed his Eighth Amendment claim as a *Roper* and *Atkins* challenge and that the Florida Supreme Court answered that issue; case closed.  The Florida Supreme Court's synopsis of Kearse's arguments would certainly lead one to think that this case is as simple as that.  *See Kearse*, 969 So. 2d at 991–92.  Yet Kearse's state petition shows otherwise—it makes clear that the Florida Supreme Court's synopsis is a patently unreasonably narrow characterization of Kearse's Eighth Amendment argument.[4]

Contrary to what the majority says, Kearse made a much broader Eighth Amendment argument than the Florida Supreme Court said he did.  The heart of Kearse's argument was not *Roper* and *Atkins*; it was proportionality.  The thrust of his argument was that his crime and circumstances do not warrant death.  He argued that neither the penological purpose of deterrence nor retribution would be served in his case.  (And, by my count, he relied on eight other Supreme Court cases to help make these points—not including citations in parentheticals.)

To be sure, Kearse relied on *Atkins* and *Roper* heavily.  But those cases were mere vehicles for his proportionality claim,

---

the former is clearly established federal law, and that Kearse invoked it here—but only the latter was at issue in *Pulley*.  *See id.* at 43–44.  So, if anything, *Pulley* further supports my dissent and disagreement with the State's position.

[4] *See* Petition for Writ of Habeas Corpus at 24–35, *Kearse v. Florida*, 969 So. 2d 976 (Fla. 2007) (Nos. SC05–1876, SC06–942), 2006 WL 1463594.

15-15228 WILSON, J., Concurring in part and Dissenting in part    5

examples of constitutional reasoning that he says protects him from execution. In fact, before us, Kearse concedes that he does not meet the criteria of *Atkins*'s or *Roper*'s bright-line rule. Why would Kearse concede the heart of his state-court argument when attacking the related state-court decision in federal court? The answer is the simplest one: That was never the heart of his argument.[5]

"What eighteen-year-old Kearse did was horrible—but his actions in light of the bizarre circumstances in this case do not warrant the ultimate penalty of death." *Kearse*, 770 So. 2d at 1138 (Anstead, J., dissenting). No matter whether the Florida Supreme Court ultimately agreed with that sentiment in the postconviction appeal for Kearse's Eighth Amendment claim, it should have squarely addressed the claim as it was made and analyzed Kearse's sentence for proportionality. Its failure to do so was "objectively unreasonable." *See Lockyer*, 538 U.S. at 75–76. Therefore, I dissent.

---

[5] Certainly, Kearse phrased *some* analysis in terms of membership in a class that he argues should be categorically ineligible for death. But at bottom, he was arguing for individual, proportionality-based relief, not for a categorical, bright-line exemption based on his age or intellectual ability.